T.C. Memo. 2007-50

UNITED STATES TAX COURT

MARK N. WRIGHT AND ERICA Y. WRIGHT, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3276-05.                    Filed March 5, 2007.

        Ps established offshore entities, and an offshore
bank account and credit card, that they used to conceal
unreported income.  Ps also understated their S
corporation's income and failed to include in their
income distributions from the S corporation that
exceeded their basis.

        R determined deficiencies for 1999, 2000, and
2001, and additions to tax pursuant to sec. 6651(a)(1),
I.R.C., for 1999 and 2000.  R determined civil fraud
penalties for P-H pursuant to sec. 6663, I.R.C., for
1999, 2000, and 2001.  In the alternative to liability
for sec. 6663, I.R.C., R determined accuracy-related
penalties for Ps pursuant to sec. 6662, I.R.C., for
1999, 2000, and 2001.

        <u>Held</u>:  R's deficiency determinations for 1999,
2000, and 2001, are sustained.

Held, further, Ps are liable for the additions to tax pursuant to sec. 6651(a)(1), I.R.C., for 1999 and 2000.

Held, further, P-H is liable for the civil fraud penalty pursuant to sec. 6663, I.R.C., for 1999, 2000, and 2001.

Mark and Erica Wright, pro sese.[1]

Stephen R. Takeuchi, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge:  This case is before the Court on a petition for judicial review of a notice of deficiency issued November 23, 2004, to both petitioners for their 1999, 2000, and 2001 taxable years.  Respondent determined the following Federal income tax deficiencies, additions to tax, and penalties for petitioner Mark N. Wright's (Mr. Wright) 1999, 2000, and 2001 taxable years:[2]

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Penalty Sec. 6663 |
|------|-----------|-------------------|----------|
| 1999 | $34,194.00 | $8,528.25 | $25,645.50 |
| 2000 | 4,183.00 | 416.00 | 3,137.25 |
| 2001 | 10,495.00 | -- | 7,870.95 |

---

[1]Petitioners were represented by William Randolph Klein at trial, on briefing, and until his death on Nov. 27, 2006.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined the following Federal income tax deficiencies, additions to tax, and penalties for petitioner Erica Y. Wright's (Mrs. Wright) 1999, 2000, and 2001 taxable years:

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Penalty Sec. 6662 |
|------|-----------|-----------|-----------|
| 1999 | $34,194.00 | $8,528.25 | $6,838.80 |
| 2000 | 4,183.00 | 416.00 | 836.60 |
| 2001 | 10,495.00 | -- | 2,099.00 |

After concessions by respondent,[3] the issues for decision are:

(1) Whether petitioners failed to report distributions in excess of their basis from an S corporation, M. Wright & Associates, Inc. a.k.a Wright & Associates, Inc. (Wright & Associates), for their 1999, 2000, and 2001 taxable years in the amounts of $8,774, $21,283, and $44,151, respectively;

(2) whether petitioners understated their income from Wright & Associates by $50,000 for taxable year 1999;

(3) whether petitioners failed to include in income for their 1999 taxable year $54,000 that they deposited into an offshore account;

---

[3]Respondent has conceded that health insurance premiums that Wright & Associates paid on behalf of petitioners for 1999, 2000, and 2001, in the amounts of $5,287, $6,625, and $9,208, respectively, and for which petitioners claimed a 60-percent deduction, should not be included in petitioners' taxable income. Respondent has also conceded that Mrs. Wright is not liable for the sec. 6662 accuracy-related penalty on any portion of the underpayment to which a sec. 6663 civil fraud penalty applies.

(4) whether petitioners are liable for the addition to tax pursuant to section 6651(a)(1) for their 1999 and 2000 taxable years;

(5) whether Mr. Wright is liable for the civil fraud penalty pursuant to section 6663 for his 1999, 2000, and 2001 taxable years;

(6) whether, in the alternative, if Mr. Wright is found not to be liable for the civil fraud penalty pursuant to section 6663 on any portion of the underpayment for any of the years in issue, petitioners are liable for the accuracy-related penalty, pursuant to section 6662, on such portion of the underpayment.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference. At the time this petition was filed, petitioners resided in Sarasota, Florida.

A. <u>General Background</u>

Petitioners had been married for approximately 35 years as of the time of trial. Mr. Wright has a bachelor of science degree in business and a master's degree in business administration. Mr. Wright is a certified public accountant and certified financial planner who worked in those capacities during 1999, 2000, and 2001. Mrs. Wright has a high school education.

Mr. Wright is the sole stockholder of Wright & Associates and during 1999, 2000, and 2001 owned and operated the S corporation. A Form 1120S, U.S. Income Tax Return for an S Corporation, was filed for Wright & Associates for the years in issue. Petitioners are, and were during the years in issue, officers of Wright & Associates. Mr. Wright also owns, and owned and operated during 1999, 2000, and 2001, Consultation & Mediation Services, L.L.C. (Consultation & Mediation), a single member limited liability company. Consultation & Mediation did not file Federal tax returns for the years in issue as it was a disregarded entity[4] and its relevant tax matters were reported on Schedule C, Profit or Loss From Business, of petitioners' joint Form 1040, U.S. Individual Income Tax Return.

Mr. Wright performed accounting services for, and provided tax advice to, clients of Wright & Associates, and Mrs. Wright performed secretarial duties for Wright & Associates, for which they were compensated during the years in issue. Mr. Wright also provided investment advice to individuals, including, inter alia, Jo Ann Mohr (Ms. Mohr).[5] During 1999 and 2000, Mr. Wright taught

---

[4]"A business entity with only one owner is classified as a corporation or is disregarded; if the entity is disregarded, its activities are treated in the same manner as a sole proprietorship, branch, or division of the owner." Sec. 301.7701-2(a), Proced. & Admin. Regs.

[5]Jo Ann Mohr (Ms. Mohr) was not a client of Wright & Associates. The record does not indicate whether Ms. Mohr was a

(continued...)

an estate planning class at Nova Southeastern University for which he was compensated.  Mr. Wright also received compensation from Security Mutual Life Insurance Company in 1999 and 2000, although it is unclear what services he performed.

B. Filing of Federal Tax Returns

1. Petitioners' Joint Returns

Petitioners requested an extension of time to August 15, 2000, to file their joint 1999 Form 1040 Federal income tax return.  On their request for an extension, petitioners estimated their tax liability to be zero and remitted no payment.  Petitioners mailed their 1999 return on November 21, 2001, and respondent received it on November 23, 2001.

Petitioners requested an extension of time to August 15, 2001, to file their joint 2000 Form 1040 Federal income tax return, and subsequently requested a further extension to October 15, 2001.  On their first request for an extension, petitioners left the line for the estimate of their tax liability blank and remitted no payment.  Respondent approved petitioners' second request.  Respondent received petitioners' 2000 return on December 3, 2001.

Petitioners requested an extension of time to August 15, 2002, to file their joint 2001 Form 1040 Federal income tax

---

[5](...continued)
client of Consultation & Mediation or a personal client of Mr. Wright.

return, and they subsequently requested a further extension to October 15, 2002.  On their first request for an extension, petitioners estimated their tax liability to be $23 and remitted no payment.  Petitioners mailed their 2001 return on August 20, 2002, and respondent received it on August 23, 2002.

### 2. Wright & Associates' Returns

Mr. Wright was responsible for filing Wright & Associates' Federal tax returns for the years in issue.  Respondent received Wright & Associates' Form 1120S for its 1999 taxable year on November 23, 2001.  Respondent received Wright & Associates' 2000 Form 1120S on December 3, 2001.  Wright & Associates requested an extension of time to file its 2001 Form 1120S to September 15, 2002.  Respondent received Wright & Associates' 2001 Form 1120S on August 23, 2002.

On Schedule B, Other Information, of the 1999, 2000, and 2001 Forms 1120S, both cash and accrual were checked as the method of accounting.  Wright & Associates did not list any trade notes or accounts receivables on its balance sheets or on Schedule L, Balance Sheets per Books, of its 1999, 2000, and 2001 Forms 1120S.

### C. Distributions

During 1999, Wright & Associates distributed to petitioners $64,601.  Wright & Associates also issued checks totaling $5,580

to petitioners' children.[6]  Also during 1999, Wright & Associates issued checks totaling $5,510 to Consultation & Mediation.

During 2000, Wright & Associates transferred to petitioners amounts totaling $32,075 either by check or transfer to petitioners' personal bank account.  Of the total amount transferred to petitioners, $29,405 constituted personal distributions.  Wright & Associates also issued checks to petitioners' children totaling $14,715, and to Consultation & Mediation totaling $1,250.

During 2001, Wright & Associates distributed to Mr. Wright $87,864.64.  In addition, for each of the years in issue, Wright & Associates paid for petitioners' health insurance.  The premiums for this insurance for 1999, 2000, and 2001, were $5,287, $6,625, and $9,208, respectively, for which petitioners claimed a 60-percent deduction.

D. Offshore Banking, Investments, and Transactions

During the years in issue, petitioners maintained an offshore bank account and credit card.  The offshore bank account was at Leadenhall Trust Company, Ltd. (Leadenhall), in the Bahamas.  Leadenhall issued petitioners a Mastercard credit card.[7]  In addition, Mr. Wright made offshore investments for

---

[6]Petitioners' children paid back $916 to Wright & Associates.

[7]The Mastercard credit card issue by Leadenhall operated
(continued...)

petitioners and advised Ms. Mohr to make similar investments. Petitioners and Ms. Mohr invested in Cash-4-Titles, an investment scheme promoted and operated by individuals and business entities in the United States, the Bahamas, and the Cayman Islands.[8] Cash-4-Titles was in fact a massive illegitimate "Ponzi scheme" later shut down by the Securities Exchange Commission (SEC),[9] and investigated as part of the Internal Revenue Service's (IRS) Offshore Credit Card project.[10]  Mr. Wright was apparently

---

[7](...continued)
similar to a debit card.  The funds petitioners deposited in their Leadenhall bank account were used to pay for the charges they incurred on their Mastercard credit card.

[8]The operation of Cash-4-Titles is explained in Ex parte Dill, Dill, Carr, Stonbraker & Hutchings, P.C., 866 So. 2d 519, 522 (Ala. 2003), as follows: "' Messrs Homas and Gause raised money from investors * * * that was to be loaned to C4T, which in turn would finance the Cash 4 Titles' stores to make car loans to the general public.'  * * * 'Messrs Homa and Gause agreed to pay investors between 1% and 4% per month on funds loaned to C4T and remit the interest payments to investors on a monthly basis.'" In fact, "'most, if not all of the investor funds were not used by C4T * * * for the car title loan business.  Instead, C4T * * * transferred the funds to accounts at the Bank of Bermuda in the Cayman Islands controlled by Messrs Homa and Gause and used the funds, in classic Ponzi scheme fashion, to pay interest to investors and pay personal expenses for Messrs Homa and Gause to support their lavish lifestyle.'"  Id. at 524.

[9]See SEC v. Homa, 2004 WL 1474580 (N.D. Ill. 2004); SEC v. Homa, 2004 WL 1093492 (N.D. Ill. 2004).

[10]On brief and at trial, petitioners object pursuant to Fed. R. Evid. 408 to the Court's consideration of testimony by Internal Revenue Agent Robert Sullivan (Mr. Sullivan) about an alleged "deal" Mr. Wright attempted to make with Mr. Sullivan during the examination process.  The Court need not consider the objection further because Mr. Sullivan's testimony would not
(continued...)

unaware that Cash-4-Titles was a Ponzi scheme, but was aware of the offshore credit cards and the tax evasion opportunity they offered, at the time he recommended it to Ms. Mohr and invested himself.

Petitioners and Ms. Mohr made several investments in Cash-4-Titles. The investments in which petitioners and Ms. Mohr both participated resulted in class action lawsuits. Another investment, in which only Ms. Mohr participated, resulted in a National Association of Securities Dealers (NASD) claim by Ms. Mohr against Mr. Wright for "violations of the Florida Securities and Investor Protection Act; violations of federal securities laws; breach of contract; common law fraud; breach of fiduciary duty; negligence and gross negligence."

1. Class Action Lawsuit

In the first type of investment in Cash-4-Titles, petitioners and Ms. Mohr invested in offshore entities known as "companies limited by guarantee" (CLGs).[11] Mr. Wright paid an

---

[10](...continued)
affect the Court's conclusions. Thus, notwithstanding the trial ruling admitting Mr. Sullivan's testimony, the Court has not considered his testimony in that regard in deciding this case.

[11]A company limited by guarantee (CLG) is an entity of United Kingdom origin that does not have an exact counterpart in U.S. tax law. Bahamian law defines a "company limited by guarantee" as "a company [that] is formed on the principle of having the liability of its members limited to such amount as the members respectively undertake to contribute to the assets of the company in the event of a winding up". Companies Act 1992, Act
(continued...)

application fee of $2,000 to create an offshore investment package, which consisted of a legal opinion letter regarding the U.S. tax law compliance of CLGs,[12] and an investment portfolio that included CLGs and petitioners' Leadenhall bank account and Mastercard credit card. Mr. Wright, acting through Hal Jones (Mr. Jones), a Cash-4-Titles promoter, created the CLGs to be conduits to funnel his and his clients' funds to a new mutual fund.

The mutual fund was set up and run in the Bahamas by Cardinal International, which, in turn, was supposed to have invested the funds in the U.S. title loan business a.k.a Cash-4-Titles. Ms. Mohr invested in a CLG called Blues Brothers Limited (Blues Brothers), and petitioners invested in CLGs called Britannia, Footpaths Limited, and Sarasota Investment Club #2. The Mastercard credit card that Leadenhall issued to, and that was used by, petitioners was in the name of one of their CLGs, Sarasota Investment Club #2.

Shortly after petitioners and Ms. Mohr made the investments, Cash-4-Titles was shut down by the SEC. A class action lawsuit and a lawsuit by the court-appointed receiver were commenced against Bank of Bermuda by or on behalf of the American

---

[11](...continued)
No. 18, sec. 7 (1992).

[12]The opinion letter was issued by Dean & Heimos, L.L.C., a Colorado law firm.

investors, in which petitioners and Ms. Mohr participated.[13]  The lawsuits were settled, and petitioners and Ms. Mohr recovered some of their invested funds.[14]

2. National Association of Securities Dealers Claim

The second type of Cash-4-Titles investment, which Ms. Mohr made through Mr. Wright, was represented by Mr. Wright to be in annuities and mutual funds.  Mr. Wright received income from selling the mutual funds, which income he assigned to Wright & Associates.  Ms. Mohr, per Mr. Wright's recommendation, purchased through her Prim Securities, Inc. (Prim Securities) account promissory notes of Rolls Royce Ltd. (Rolls Royce), which was another CLG used to raise funds for Cash-4-Titles.  On January 11, 2000, shortly after the SEC began its investigation into Cash-4-Titles, Ms. Mohr, through her attorney, requested by letter that Mr. Wright return her invested funds.  On May 11, 2000, Ms. Mohr instituted an NASD claim against Mr. Wright and Prim Securities.[15]  Ms. Mohr's claim was settled via NASD dispute

---

[13]See Stenger v. Leadenhall Bank & Trust Co., 2004 WL 609795 (N.D. Ill. 2004); Wolff v. Cash 4 Titles, 2001 WL 34133833 (S.D. Fla. 2001), affd. 135 Fed. Appx. 329 (11th Cir. 2005); see also Wolff v. Cash 4 Titles, 351 F.3d 1348 (11th Cir. 2003).

[14]The record does not indicate the amount of petitioners' or Ms. Mohr's recovery.

[15]Ms. Mohr's NASD claim against Mr. Wright and Prim Securities involved her investment in Rolls Royce Ltd. promissory notes.  It was separate from, and did not include, her investment in the Blues Brothers Limited CLG that resulted in her

(continued...)

resolution.  In 2002, Ms. Mohr was awarded $159,575.82 by NASD, of which Mr. Wright was responsible for $123,342.14.[16]

Mr. Wright made what he characterized as a $50,000 accounting adjustment to reflect and create a reserve for Ms. Mohr's NASD claim on Wright & Associates' 1999 tax return.  On the 1999 Form 1120S, $50,000 was included in the $53,485 return and allowance amount listed on line 1(b), which was subtracted from gross receipts or sales on line 1(a).  As a result, Wright & Associates' and ultimately petitioners' taxable incomes were decreased by $50,000 for 1999.  The accounting adjustment offsetting the debit entry to return and allowance was a credit to a shareholder loan payable account for Mr. Wright.

### 3. Offshore Credit Card Account

Petitioners maintained an offshore credit card at Leadenhall in the name of Sarasota Investment Club #2 for all of the years in issue.  On October 22, 1999, petitioners deposited six $9,000 checks, totaling $54,000, into their bank account at Leadenhall. One Leadenhall deposit check was dated October 4, 1999, two were dated October 5, 1999, and three were dated October 6, 1999. Petitioners used their credit card to make personal expenditures

---

[15](...continued)
participation in the class action lawsuits.

[16]Prim Securities settled with Ms. Mohr for $36,233.68, which was deducted from Ms. Mohr's award of $159,575.82.

and paid for these expenditures with the $54,000 deposited in their Leadenhall bank account.

E. Petitioners' Health

Mr. Wright has experienced health problems in recent years. In 2003, Mr. Wright had a stroke. In 2004, he developed chest pressure and following a stress test underwent several procedures including two heart catheterizations and placement of stents into obstructed arteries. In 2005, Mr. Wright sought treatment for memory loss and was scheduled to receive further memory testing at the time of trial. Mrs. Wright also has health problems having suffered from Crohn's disease for more than 20 years.

F. Procedural History

On November 22, 2002, petitioners filed a joint bankruptcy petition under chapter 13 of the Bankruptcy Code. On March 5, 2004, the bankruptcy court issued an order denying confirmation and dismissing the case. In response, Mr. Wright on March 10, 2004, filed a voluntary conversion of his chapter 13 case to a chapter 7 case. Mrs. Wright did not join in the conversion. As a result, the bankruptcy court directed that the joint bankruptcy case be separated on July 1, 2004. In September 2005, the bankruptcy court adjudged Mr. Wright's debts to Ms. Mohr, then in the amount of $172,010.17, to be nondischargeable. Mr. Wright's chapter 7 case was discharged by the bankruptcy court on December

8, 2004, pursuant to 11 U.S.C. section 727 (2000). Mrs. Wright's chapter 13 bankruptcy was closed on January 31, 2005.

The above-mentioned notice of deficiency was issued to petitioners on November 23, 2004. Petitioners filed a timely petition disputing the deficiencies, additions to tax, and penalties, on February 22, 2005.[17] As the petition was timely filed, and was not filed during a period the automatic stay was in effect, this Court has jurisdiction.[18]

---

[17]A taxpayer has 90 days (or 150 days if the notice is addressed to a person outside the United States) from the date that the notice of deficiency is mailed to file a petition with this Court for a redetermination of the contested deficiency. Sec. 6213(a). Respondent mailed the notice of deficiency to petitioners on Nov. 23, 2004. The 90th day thereafter was Monday, Feb. 21, 2005, which was a legal holiday in the District of Columbia. See Rule 25(b). "When the last day prescribed under authority of the internal revenue laws for performing any act falls on * * * a legal holiday, the performance of such act shall be considered timely if it is performed on the next succeeding day which is not a * * * legal holiday." Sec. 7503. Pursuant to sec. 7503, the last day petitioners could have filed a petition with this Court was Tuesday, Feb. 22, 2005, one day later than the date on the notice of deficiency.

[18]The Bankruptcy Code, specifically 11 U.S.C. sec. 362(a)(8) (2000), expressly bars "the commencement or continuation of a proceeding before the United States Tax Court concerning * * * the tax liability of a debtor who is an individual". Unless relief from the automatic stay is granted by order of the bankruptcy court, see 11 U.S.C. sec. 362(d) (2000), the automatic stay generally remains in effect until the earliest of the closing of the case, the dismissal of the case, or the grant of a denial or a discharge. 11 U.S.C. sec. 362(c)(2) (2000). The normal 90-day period for filing a timely petition with this Court is suspended for the period during which the taxpayer is prohibited by reason of the automatic stay from filing a petition in this Court and for 60 days thereafter. Sec. 6213(f).

OPINION

I.   Burden of Proof

As a general rule, the Commissioner's determination of a taxpayer's liability for an income tax deficiency is presumed correct, and the taxpayer bears the burden of proving that the determination is improper.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  A limitation on this general rule potentially applies in this case.  Courts of Appeals, including that for the Eleventh Circuit, to which an appeal in this case would normally lie, have indicated that before the Commissioner may rely on the presumption of correctness in unreported income cases the determination must be supported by at least a "minimal" factual predicate or foundation of substantive evidence linking the taxpayer to the income generating activity or to the receipt of funds.  Blohm v. Commissioner, 994 F.2d 1542, 1549 (11th Cir. 1993), affg. T.C. Memo. 1991-636; see also Palmer v. United States, 116 F.3d 1309, 1313 (9th Cir. 1997); United States v. Walton, 909 F.2d 915, 918-919 (6th Cir. 1990).

Where the Commissioner introduces such evidence to support a determination that the taxpayer received unreported income, as respondent did here, the burden generally is on the taxpayer to show by a preponderance of the evidence that the determination was arbitrary or erroneous.  Hardy v. Commissioner, 181 F.3d 1002, 1004 (9th Cir. 1999), affg. T.C. Memo. 1997-97.  Deductions

are a matter of legislative grace, and the taxpayer bears the burden of proving that he is entitled to any claimed deductions. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

However, pursuant to section 7491(a), the burden of proof on any factual issue that affects the taxpayer's tax liability may be shifted to the Commissioner where the "taxpayer introduces credible evidence with respect to * * * such issue". The burden will shift only if the taxpayer has, inter alia, complied with substantiation requirements pursuant to the Internal Revenue Code and "cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews". Sec. 7491(a)(2). In the instant case, petitioners did not present any credible evidence at trial. Notably, the Court did not find Mr. Wright's testimony to be credible, as he often provided inconsistent and implausible answers. In addition, petitioners did not comply with the substantiation requirements and failed to provide respondent with requested documents.[19] Accordingly, section 7491(a) is inapplicable, and the burden

---

[19]Respondent sent Wright & Associates Form 4564, Information Document Request, on July 9 and Dec. 16, 2002, and Jan. 9, 2003, to which petitioners failed to respond fully and properly. Respondent then formally repeated the three requests by issuing Formal Document Requests with a letter explaining the matter on Dec. 5 and 19, 2002, and Jan. 27, 2003. Subsequently, during discovery, petitioners failed to respond to respondent's interrogatories and request for production of documents, and provided incomplete responses after the Court granted respondent's motions to compel. See infra note 20.

remains on petitioners to prove that respondent's determination of income tax deficiencies is incorrect.

## II. S Corporations

### A. General Rules

An S corporation is a small business corporation that has an S corporation election in effect for the taxable year pursuant to section 1362(a). Sec. 1361(a)(1). Sections 1366 through 1368 govern the tax treatment of S corporation shareholders. Section 1366(a)(1) provides that a shareholder shall take into account his or her pro rata share of the S corporation's items of income, loss, deduction, or credit for the S corporation's taxable year ending with or in the shareholder's taxable year. Stated otherwise, section 1366 establishes a regime under which items of an S corporation are generally passed through to shareholders, rather than being subject to tax at the corporate level. Section 1366(d)(1), however, limits the aggregate amount of such flowthrough losses and deductions that a shareholder may claim to the sum of (1) his or her adjusted basis in the stock of the S corporation and (2) his or her adjusted basis in any indebtedness of the S corporation to the shareholder.

As regards basis, section 1012 sets forth the foundational principle that the basis of property for tax purposes shall be the cost of the property. Cost, in turn, is defined by regulation as the amount paid for the property in cash or other

property.  Sec. 1.1012-1(a), Income Tax Regs.  Section 1367 specifies adjustments to basis applicable to investments in S corporations.  Basis in S corporation stock is increased by income passed through to the shareholder under section 1366(a)(1) and decreased by, inter alia, distributions not includable in the shareholder's income pursuant to section 1368; items of loss and deduction passed through to the shareholder under section 1366(a)(1); and certain nondeductible, noncapital expenses.  Sec. 1367(a).

B. Distributions

Section 1368 addresses the treatment of distributions and differentiates S corporations having accumulated earnings and profits by reason of prior periods of operation as a C corporation and those without.  For S corporations with accumulated earnings and profits, dividend treatment applies in enumerated circumstances.  Sec. 1368(c).  The typical rule for entities without accumulated earnings and profits, such as Wright & Associates, is that distributions are not included in a shareholder's gross income to the extent that they do not exceed the adjusted basis of his or her stock (but are applied to reduce basis), while any distribution amount in excess of basis is treated as gain from the sale or exchange of property.  Sec. 1368(b).

A taxpayer must establish the basis of his or her stock for purposes of determining the amount of gain he or she must recognize. "Proof of basis is a specific fact which the taxpayer has the burden of proving." O'Neill v. Commissioner, 271 F.2d 44, 50 (9th Cir. 1959), affg. T.C. Memo. 1957-193. Internal Revenue Agent Robert Sullivan and respondent both specifically requested that petitioners provide information about Mr. Wright's stock basis in Wright & Associates.[20] Petitioners, despite Mr. Wright's extensive experience with accounting and tax matters, failed to comply.

Petitioners received $64,601, $29,405, and $87,864.64, as distributions from Wright & Associates in 1999, 2000, and 2001, respectively. Respondent determined that to the extent the distributions exceeded basis, petitioners were required to include them in their income in the amounts of $8,774, $21,283, and $44,151, for 1999, 2000, and 2001, respectively.

---

[20]Respondent served on petitioners interrogatories and a request for production of documents on Aug. 26, 2005, requesting, inter alia, that petitioners provide calculations of their basis in Wright & Associates from its incorporation through 1998. Petitioners failed to respond, and respondent filed with the Court on Sept. 29, 2005, a motion to compel production of documents and a motion to compel responses to respondent's interrogatories. The Court, by orders dated Sept. 30, 2005, granted both of respondent's motions to compel. Petitioners' responses to the orders to compel failed to provide the requested calculations or documents. Petitioners' response to respondent's request for production stated that "Petitioners have no records prior to 1999."

In the computation of Mr. Wright's stock basis, respondent did not allow the carryover of any basis that Mr. Wright may have had in his stock for taxable years preceding 1999. It is possible that Mr. Wright had a tax basis in his stock prior to taxable year 1999. However, petitioners did not produce any evidence or provide any documentation, other than old tax returns without any substantiation of their numeric content, to establish the basis of Mr. Wright's stock. The Court therefore sustains respondent's determination that Mr. Wright was not entitled to any carryover basis in his Wright & Associates stock for taxable years preceding 1999. The Court also sustains respondent's determinations that petitioners received income in the amounts of $8,774, $21,283, and $44,151 from Wright & Associates in 1999, 2000, and 2001, respectively.

C. Accounting Method

An S corporation may use either the cash receipts and disbursement method (cash method) or the accrual method of accounting, with certain limitations. See Rev. Proc. 2002-28, 2002-1 C.B. 815. Under the cash method, all items which constitute gross income are to be included for the taxable year in which actually or constructively received. Sec. 1.446-1(c)(1)(i), Income Tax Regs. Expenditures are deducted for the taxable year in which actually made. Secs. 1.446-1(c)(1)(i), 1.461-1(a), Income Tax Regs.

Under the accrual method, "income is to be included for the taxable year when all the events have occurred that fix the right to receive the income and the amount of the income can be determined with reasonable accuracy" (all events test).  Sec. 1.446-1(c)(1)(ii), Income Tax Regs.  A liability is incurred and taken into account "in the taxable year in which all the events have occurred that establish the fact of the liability, the amount of the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability".  Id.  In determining whether an expense amount has been incurred, the all events test generally shall not be treated as met any earlier than when economic performance occurs.  Sec. 461(h)(1).

"The all events test is based on the existence or nonexistence of legal rights or obligations at the close of a particular accounting period, not on the probability--or even absolute certainty--that such right or obligation will arise at some point in the future."  Hallmark Cards, Inc. v. Commissioner, 90 T.C. 26, 34 (1988).  Furthermore:

> It is fundamental to the "all events" test that, although expenses may be deductible before they have become due and payable, liability must first be firmly established.  This is consistent with our prior holdings that a taxpayer may not deduct a liability that is contingent or contested.  Nor may a taxpayer deduct an estimate of an anticipated expense, no matter how statistically certain, if it is based on events that have not occurred by the close of the taxable year. [Citations omitted; emphasis added.]

United States v. Gen. Dynamics Corp., 481 U.S. 239, 243-244 (1987).

A deduction shall be taken for the year which is the proper year under the taxpayer's method of tax accounting.  Sec. 461(a). It is not entirely clear what method of accounting Wright & Associates was using for its 1999, 2000, and 2001 taxable years. Both cash and accrual method were checked on Schedule B of Wright & Associates' 1999, 2000, and 2001 Forms 1120S.  Mr. Wright indicated at trial that the returns were in error and that Wright & Associates was on the accrual method.  However, Wright & Associates had no trade notes or accounts receivables on its balance sheets or Schedule L of Forms 1120S for 1999, 2000, or 2001.  Mr. Wright noted that hypothetically a business could be on the accrual method and have no trade notes or accounts receivables if they were all paid or collected.  Based on Wright & Associates' lacking any trade notes or account receivables on its 1999, 2000, and 2001 balance sheets and Schedule L of its Forms 1120S, the Court concludes that Wright & Associates, despite Mr. Wright's knowledge of tax and accounting, had no consistent method of accounting.

Mr. Wright contends that Ms. Mohr's claim, although not made against Wright & Associates, was a liability of that corporation, which reduced its income for 1999 by $50,000, and as a result, reduced petitioners' 1999 taxable income by the same amount.  It

is noteworthy that no such liability was reflected on Wright & Associates' books and tax return.[21]  Nor was any liability attributable to Ms. Mohr's claim properly deductible for 1999 by the corporation, or by petitioners, under either the cash or accrual method of accounting.  Under the cash method, no deduction should have been recognized until an amount was paid to Ms. Mohr.  In 1999, no payment by Wright & Associates or Mr. Wright was made to Ms. Mohr.

Under the accrual method, the all events test for liabilities was not satisfied in 1999 for Ms. Mohr's claim against Mr. Wright, and there was never a claim against Wright & Associates.  Ms. Mohr did not make a demand for the return of her invested funds from Mr. Wright until January of 2000, did not file a formal claim with NASD until May 2000, and did not have a fixed legal right to the return of her invested funds until the dispute was resolved in 2002.

Mr. Wright seeks in the alternative to justify the $50,000 deduction for 1999 as an accrued liability of his own, for which he allegedly made a reserve.  Mr. Wright was not entitled to

---

[21]On Wright & Associates' 1999 Form 1120S, $50,000 was improperly included in the $53,485 return and allowance amount listed on line 1(b), which was subtracted from gross receipts or sales on line 1(a).  The notice of deficiency disallowed $50,000, reducing the return and allowance amount to $3,485 and eliminating the $50,000 alleged loan from Mr. Wright shown on Wright & Associates' books.

accrue such a deduction under the all events test.[22]  See

Hallmark Cards Inc. v. Commissioner, supra at 34; United States

v. Gen. Dynamic Corp., supra at 243-244.  Therefore, neither Mr.

Wright nor Wright & Associates was entitled to deduct $50,000 for

1999 in respect of Ms. Mohr's NASD claim.  Accordingly, the Court

sustains respondent's $50,000 adjustment to petitioners' taxable

income for 1999.

## III. Offshore Accounts and Credit Card

### A. Bank Deposits Method

A bank deposit is prima facie evidence of income, and the

Commissioner is not required to show a likely source of that

income.  Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  The

taxpayer bears the burden of showing that respondent's

determination is incorrect.  Rule 142(a); Estate of Mason v.

Commissioner, 64 T.C. 651, 657 (1975), affd. 566 F.2d 2 (6th Cir.

1977).  "The bank deposits method assumes that all money

deposited in a taxpayer's bank account during a given period

constitutes taxable income, but the Government must take into

account any nontaxable source or deductible expense of which it

has knowledge."  Clayton v. Commissioner, 102 T.C. 632, 645-646

---

[22]No economic performance, within the meaning of sec. 461(h)(2)(C) and the regulations thereunder, occurred with respect to the alleged liability during any year in issue.  Also, no transfer was made such as would entitle Mr. Wright or Wright & Associates to accrue a contested liability under sec. 461(f).

(1994) (citing <u>DiLeo v. Commissioner</u>, 96 T.C. 858, 868 (1991)), affd. 959 F.2d 16 (2d Cir. 1992).

Respondent produced bank deposit records, as well as copies of petitioners' checks, showing that petitioners deposited $54,000 into their Leadenhall bank account. Mr. Wright had initially told the IRS agents assigned to his case that the $54,000 was a loan from an investor who wanted to remain anonymous. Petitioners' reply brief filed with the Court further contended that the $54,000 was a loan and not income. At trial Mr. Wright claimed that the six $9,000 checks totaling $54,000 represented petitioners' money, but stated: "I'm not saying they came from previously reported income; I'm saying they are not income." Mr. Wright additionally stated that the $54,000 was sent to Mr. Jones and then deposited by Mr. Jones into petitioners' Leadenhall account.[23] Mr. Wright also claimed at trial that he never opened a bank account at Leadenhall or obtained a Mastercard credit card, which the Court did not find convincing or credible.

Petitioners did not present any evidence to refute respondent's determination that the $54,000 was unreported

---

[23]Mr. Wright asserts that petitioners and Ms. Mohr entered into asset management contracts with Mr. Jones that included a best efforts 6-percent return and that Mr. Jones transferred the money from those contracts to CLGs. The Court did not find Mr. Wright's testimony on this issue to be convincing or credible. Furthermore, petitioners did not provide the alleged contracts or any other evidence regarding such an agreement with Mr. Jones.

income, but instead espoused inconsistent and implausible explanations.  The Court concludes that the $54,000 deposited by petitioners into their Leadenhall bank account was unreported income.  Accordingly, the Court sustains respondent's determination on this issue.

B. Money and Finance Regulations

Regulations prescribe that transactions involving the transfer of more than $10,000 in monetary instruments at one time from the United States to a place outside of the United States, or vice versa, must be reported to the Secretary of the Treasury by the individual involved.  See 31 U.S.C. sec. 5316 (2000); 31 C.F.R. sec. 103.23 and 103.27 (2000).  "Monetary instruments" includes all negotiable instruments, such as checks.  31 C.F.R. 103.11(u) (2000).  Violation of the reporting requirements applicable to the exportation or importation of monetary instruments can result in criminal penalties consisting of fines, imprisonment, or both.  See 31 U.S.C. sec. 5322 (2000).

In response to questioning regarding the avoidance of such reporting requirements, Mr. Wright could not explain why he would issue six $9,000 checks (all drawn on the same Sun Trust bank account) over a period of 3 consecutive days, all to be deposited on the same day in the Bahamas, instead of one check for $54,000.  The Court concludes that Mr. Wright structured petitioners' deposit transaction so as to avoid the exportation of monetary

instruments reporting requirements and to conceal $54,000 in income.

IV.   Penalties and Addition to Tax

     A. Burden of Production

The Commissioner bears the burden of production in any court proceeding with respect to an individual's liability for penalties or additions to tax.  Sec. 7491(c).  To meet this burden, the Commissioner must present "sufficient evidence indicating that it is appropriate to impose the relevant penalty" or addition to tax.  Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  In instances where an exception to the penalty or addition to tax is afforded because of substantial authority, reasonable cause, or similar provisions, the taxpayer bears the burden of proof with regard to those matters.  Id. at 446-447.

     B. Section 6651(a)(1) Addition to Tax

Section 6651(a)(1) imposes a 5-percent addition to tax for each month or portion thereof a required return is filed after the prescribed due date (including extensions), not to exceed 25 percent in the aggregate, unless such failure to file timely is due to reasonable cause and not due to willful neglect.  Although not defined in the Code, "reasonable cause" is described by the applicable regulations as the exercise of "ordinary business care and prudence".  Sec. 301.6651-1(c)(1), Proced. & Admin. Regs.; see also United States v. Boyle, 469 U.S. 241, 246 (1985).

"[W]illful neglect" is interpreted as "a conscious, intentional failure or reckless indifference." <u>United States v. Boyle</u>, <u>supra</u> at 245.

Reasonable cause denotes an absence of fault. <u>United States v. Boyle</u>, <u>supra</u> at 247 n.4. A taxpayer must prove that his failure to file timely was the "result neither of carelessness, reckless indifference, nor intentional failure." <u>Id.</u> "Generally, factors that constitute 'reasonable cause' include unavoidable postal delays, death or serious illness of the taxpayer or a member of his immediate family, or reliance on the mistaken legal opinion of a competent tax advisor, lawyer, or accountant that it was not necessary to file a return." <u>Marrin v. Commissioner</u>, 147 F.3d 147, 152 (2d Cir. 1998), affg. T.C. Memo. 1997-24. While the Court is sympathetic that Mr. Wright suffered health complications, all of these complications occurred after the years in issue. Mr. Wright had a stroke in 2003 and sought treatment for memory loss in 2005. Petitioners have not shown reasonable cause for filing their 1999 and 2000 tax returns late. The Court concludes that petitioners are liable for the addition to tax pursuant to section 6651(a)(1) for

1999 and 2000.[24]  Accordingly, the Court sustains respondent's determination on this issue.[25]

C. Section 6663 Penalty

In any case involving the issue of fraud with intent to evade tax, respondent bears the burden of proof as to that issue. Sec. 7454(a).  The burden of proof must be carried by clear and convincing evidence.  Rule 142(b).  Section 6663(a) imposes a penalty of "an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud."  Section 6663(b) specifies that if any portion of the underpayment is attributable

---

[24]The notice of deficiency apparently calculates petitioners' 1999 sec. 6651(a)(1) addition to tax based on an Aug. 15, 2000, due date despite petitioners' failure to reasonably estimate their tax liability on their request for an extension.  The notice of deficiency calculates petitioners' 2000 sec. 6651(a)(1) addition to tax based on an Oct. 15, 2001, due date, respondent having granted petitioners' second request for an extension despite petitioners' failure to reasonably estimate their tax liability on their first request for an extension. Respondent failed to raise these issues in his answer and only subsequently raised them on brief.

[25]The Court sustains respondent's determinations in the notice of deficiency.  See supra note 24.  The Court notes that because 25 percent is the maximum addition to tax allowed under sec. 6651(a)(1), the validity of the extension request is moot for petitioners' 1999 taxable year (petitioners filed their 1999 return on Nov. 23, 2001, which is more than 15 months late using an Aug. 15, 2000, due date and more than 19 months late using an Apr. 15, 2000, due date).  The Court concludes, based on respondent's granting petitioners' second request for an extension, respondent's claim in the notice of deficiency, and respondent's failure to raise this issue before trial which may have prejudiced petitioners, that petitioners are liable for only a 10-percent sec. 6651(a)(1) addition to tax for their 2000 taxable year.

to fraud, the entire underpayment shall be treated as attributable thereto except to the extent the taxpayer establishes, by a preponderance of the evidence, that some part is not due to fraud.  Where taxpayers file a joint return, section 6663 does not apply to a spouse unless some part of the underpayment is due to the fraud of the spouse.  Sec. 6663(c).

Respondent must prove on a year-by-year basis by clear and convincing evidence that (1) Mr. Wright underpaid his taxes for that year, and (2) that some part of that underpayment was due to fraud.  Parks v. Commissioner, 94 T.C. 654, 660-661 (1990); Hebrank v. Commissioner, 81 T.C. 640, 642 (1983).

1. Underpayment of Tax

In satisfying the first prong of the fraud test, the Commissioner cannot discharge his burden by simply relying on the taxpayer's failure to prove error in his determination of the deficiency.  Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989); Otsuki v. Commissioner, 53 T.C. 96, 106 (1969).  The Commissioner's burden of proving an underpayment of tax attributable to unreported and indirectly reconstructed income may be satisfied in either of two ways:  (1) By proving a likely source of the unreported income, or (2) by disproving any alleged nontaxable source.  DiLeo v. Commissioner, 96 T.C. at 873-874.

Respondent has met his burden for all of the years in issue. Petitioners and respondent stipulated the amount and source of

the distributions that petitioners received from Wright & Associates but failed to include in their income. In addition, respondent has met his burden of disproving an alleged nontaxable source for the $54,000 petitioners deposited into their offshore bank account in 1999. Mr. Wright initially alleged that the $54,000 deposited into petitioners' Leadenhall bank account in 1999 was nontaxable as it was a loan. He claimed at trial that the $54,000 was in fact petitioners' money but was nontaxable. He also claimed that the $54,000 was sent to Mr. Jones and that Mr. Jones deposited it into petitioners' Leadenhall bank account. Mr. Wright's numerous explanations are inconsistent. Accordingly, the Court concludes that respondent has proved by clear and convincing evidence an underpayment of tax--the first prong of the fraud test--for each of the years 1999, 2000, and 2001.

### 2. Fraudulent Intent

To satisfy the second prong of the fraud test, respondent must show that a portion of the underpayment is attributable to fraud. For the purposes of section 6663, fraud, which presents a question of fact, is defined as intentional wrongdoing by the taxpayer with the specific purpose of avoiding a tax believed to be owed. Fraud includes conduct intended to conceal, mislead, or otherwise prevent the collection of such tax. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Recklitis v.

Commissioner, 91 T.C. 874, 909 (1988).  Fraud is never presumed and must be established by independent evidence of fraudulent intent.  Petzholdt v. Commissioner, supra at 699; Recklitis v. Commissioner, supra at 909-910.  The taxpayer's entire course of conduct can be indicative of fraud.  Stone v. Commissioner, 56 T.C. 213, 224 (1971).

As direct proof of a taxpayer's intent is seldom available, fraud may be established by circumstantial evidence and reasonable inferences drawn from the record.  Stoltzfus v. United States, supra at 1005; DiLeo v. Commissioner, supra at 874. Courts have developed a nonexclusive list of factors, or "badges" of fraud, that support a finding of fraudulent intent.  See Spies v. United States, 317 U.S. 492, 499 (1943); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601.  Although no single factor may be necessarily sufficient to establish fraud, the existence of several indicia may be persuasive circumstantial evidence of fraud.  Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. T.C. Memo. 1982-603.

The "badges" of fraud include:  (1) Understating income; (2) maintaining inadequate records; (3) failing to file tax returns; (4) providing implausible or inconsistent explanations of behavior; (5) concealing income or assets; (6) failing to cooperate with tax authorities; (7) engaging in illegal

activities; (8) attempting to conceal illegal activities; (9) dealing in cash; (10) failing to make estimated tax payments; and (11) filing false documents. See Spies v. United States, supra at 499; Bradford v. Commissioner, supra at 307-308. Additional factors to be considered include the taxpayer's background, level of education, and prior history of filing proper returns. Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992).

The instant case involves many "badges" of fraud. Accordingly, the Court concludes that Mr. Wright fraudulently intended to underpay taxes for 1999, 2000, and 2001. Notably, Mr. Wright is sophisticated in tax matters. He is a certified public accountant and certified financial planner, has a master's degree in business administration, and owns and operates an S corporation that provides accounting services and tax advice to its clients. Additionally, Mr. Wright failed to cooperate with the tax authorities. Mr. Wright was not a credible witness as he frequently gave inconsistent and implausible answers to questions asked during trial.

Specifically in 1999, Mr. Wright concealed income by transferring $54,000 to petitioners' offshore bank account. Mr. Wright structured petitioners' $54,000 deposit transaction specifically to avoid the exportation of monetary instruments reporting requirements. Additionally, Mr. Wright constructed a

phony offset of $50,000 against the gross receipts of Wright & Associates on Form 1120S for 1999.  Further, for all of the years in issue, petitioners used an offshore credit card to make personal expenditures in order to continue to conceal the $54,000 in unreported income.

For taxable years 1999, 2000, and 2001, Mr. Wright understated petitioners' income by failing to include distributions petitioners received from Wright & Associates, which the Court concludes is fraudulent in and of itself.  Mr. Wright also maintained inadequate records for all of the years in issue.  Additionally, Mr. Wright failed to make estimated tax payments for all of the years in issue.

The Court concludes that respondent has proved by clear and convincing evidence the second prong of the fraud test for 1999, 2000, and 2001.  Respondent has shown that at least some part of the underpayment for all of the years in issue is attributable to fraud.  Specifically, respondent has shown that petitioners understated their income for all of the years in issue because they fraudulently failed to include in their income distributions from Wright & Associates.  Respondent has also shown that petitioners concealed their unreported income by utilizing an offshore credit card for personal expenditures.  The Court concludes that Mr. Wright's entire course of conduct relating to petitioners' offshore bank account and credit card is indicative

of fraud.  Mr. Wright has failed to challenge or explain successfully why respondent's showing of underpayment of tax and fraudulent intent for each of the years in issue is inapplicable or incorrect.  The Court concludes that Mr. Wright is liable for the civil fraud penalty pursuant to section 6663 for taxable years 1999, 2000, and 2001.  Accordingly, the Court sustains respondent's determination on this issue.

V.    Conclusion

The Court sustains respondent's determinations regarding petitioners' deficiencies, as adjusted to reflect respondent's concessions, for taxable years 1999, 2000, and 2001.  Petitioners failed to include in their taxable income distributions they received from Wright & Associates that exceeded their stock basis, as well as $54,000 they deposited in their offshore account.  Mr. Wright was not entitled to a flowthrough deduction of $50,000 from Wright & Associates for 1999 on account of Ms. Mohr's NASD claim.  The Court sustains respondent's determination that petitioners are liable for the section 6651(a)(1) addition to tax for 1999 and 2000.  The Court also sustains respondent's determination that Mr. Wright is liable for the section 6663 civil fraud penalty for 1999, 2000, and 2001.

To reflect the foregoing and concessions made by respondent,

<u>Decision will be entered</u>

<u>under Rule 155</u>.