T.C. Memo. 2015-121

UNITED STATES TAX COURT

JAMES J. ISAACS, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 29303-11.            Filed June 30, 2015.

P operates two veterinary practices, one through a wholly owned S corporation (S). P donated trilobite fossils to an I.R.C. sec. 501(c)(3) qualified organization in 2006 and 2007. R audited P's and S's 2006, 2007, and 2008 Federal income tax returns and determined a deficiency in P's income tax for each year. R disallowed P's claimed I.R.C. sec. 170(a) deductions for his fossil donations and certain passthrough deductions from S for 2006, 2007, and 2008. R contends that P did not substantiate his and S's deductions. Although R did not make a determination under I.R.C. sec. 446(b), R asserts that S used the cash method of accounting and could not deduct accrued expenses. R further determined I.R.C. sec. 6662(a) accuracy-related penalties for all three tax years.

Held: R properly disallowed P's I.R.C. sec. 170(a) noncash charitable contribution deductions for 2006, 2007, and 2008 because P failed to obtain qualified appraisals of the donated fossils' values.

[*2]     Held, further, S was on the accrual method of accounting for tax years 2006, 2007, and 2008.

Held, further, P adequately substantiated certain expenses of S, but because P failed to substantiate other expenses, R properly disallowed deductions for those other expenses.

Held, further, P is not liable for I.R.C. sec. 6662(a) accuracy-related penalties with respect to certain portions of his underpayments for 2006 and 2007 because he established reasonable cause and good faith.  P is liable for I.R.C. sec. 6662(a) accuracy-related penalties with respect to the balance of his underpayments for 2006 and 2007.

James J. Isaacs, pro se.

Ray M. Camp, Jr., for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge:  Respondent determined the following deficiencies in petitioner's Federal income tax and consequent section 6662(a) accuracy-related penalties:[1]

_____

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) of 1986, as amended and in effect for the tax years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all amounts to the nearest dollar.

[*3]

| Determination | 2006 | 2007 | 2008 |
|---|---|---|---|
| Deficiency | $102,635 | $260,615 | $68,728 |
| Penalty | 20,527 | 52,123 | 13,745 |

After the filing of a stipulation of facts and a stipulation of settled issues, the facts of which are agreed to by the parties and incorporated herein by this reference, as well as a subsequent concession by respondent, the issues remaining for decision are:

(1) whether respondent properly disallowed petitioner's section 170(a) noncash charitable contribution deductions for 2006, 2007, and 2008;

(2) whether respondent properly disallowed passthrough deductions for 2006, 2007, and 2008 for certain business expenses of petitioner's wholly owned S corporation, Calabasas Veterinary Center, Inc. (CVC); and

(3) whether and to what extent petitioner is liable for section 6662(a) accuracy-related penalties for the tax years at issue.

FINDINGS OF FACT

Petitioner James J. Isaacs is a veterinarian.[2] He resided in California when he filed his petition. During 2006, 2007, and 2008 Dr. Isaacs owned and operated

---

[2]At trial petitioner asked to be addressed as "Dr. Isaacs". We refer to him as Dr. Isaacs throughout this opinion.

[*4] two veterinary clinics, one through CVC and the other through Encino Veterinary Clinic, Inc. (EVC), a C corporation. Dr. Isaacs is the sole shareholder of both corporations. During the years at issue Dr. Isaacs worked as the primary veterinarian for both clinics. For those years CVC regularly used Antech Diagnostics (Antech) for laboratory services and Miller & Co., L.L.P. (Miller & Co.), for accounting services.

CVC's Management and Inventory

Effective August 1, 2000, Dr. Isaacs signed and issued an interoffice policy to delineate responsibilities for and control of his two clinics' management, inventory, and personnel. Pursuant to the interoffice policy, EVC provided management services to CVC through Dr. Isaacs or his delegate and could elect to charge a management fee for its services. The interoffice policy left the frequency and amount of this fee to Dr. Isaacs' discretion. He elected to impose a fee in 2007 but not in 2006 or 2008.

The interoffice policy also addressed bulk inventory ordering. Vendors of vaccines, medications, surgical supplies, and other consumables used in veterinary practices commonly offer price concessions to clinics that buy in bulk. To take advantage of these incentives, Dr. Isaacs caused EVC to order supplies for both

[*5] clinics and then distributed the items between them. A log tracked the movement of supplies inventory between the clinics.

Bills for bulk-ordered supplies were directed to EVC, but pursuant to the interoffice policy, the clinics' bookkeeper allocated financial responsibility for each bill between EVC and CVC in accordance with the percentage of goods from the order distributed to each clinic. This allocation, and the only written evidence of CVC's reimbursement of EVC, was made on the clinics' books, through a pair of offsetting adjusting journal entries; CVC never wrote checks to document any transfer of money to EVC to pay for the supplies. For 2007, rather than allocate supplies expenses with adjusted journal entries, EVC instead imposed a $100,000 management fee. CVC paid the fee in nine installments along with an additional, unexplained $3,000 between April 24, 2007, and October 31, 2008.

CVC's Accounting Method and Books

On its 2006, 2007, and 2008 Forms 1120S, U.S. Income Tax Return for an S Corporation, CVC reported that it employed the accrual method of accounting. CVC has reported using the accrual method since its incorporation. Dr. Isaacs intended for CVC to use the accrual method in keeping its books and for EVC to use the cash method.

**[\*6]** CVC requires its clients to pay the fees charged for its services at the time services are rendered. It generally records its income at the time of receipt because, if its pay-in-advance-at-the-time-of-service rule is strictly followed, it does not have accounts receivable with respect to its customers. CVC did, however, report opening and closing values of, respectively, $6,045 and $10,000, for "Trade notes and accounts receivable" on Schedule L, Balance Sheet per Books, of its 2006 Form 1120S. It reported precisely offsetting opening and closing allowances for bad debts of, respectively, $6,045 and $10,000. For the 2007 tax year CVC reported an opening value for accounts receivable of $10,000 and left the closing value line blank. It reported a precisely offsetting opening allowance for bad debts of $10,000 and, as with the closing value for accounts receivable, left the closing value for allowances for bad debts blank. For 2008 CVC reported no opening or closing values for either accounts receivable or allowances for bad debts.

With regard to expenses, Cathy Fogel, who at the time of trial had served as CVC's bookkeeper since July 2008, characterized CVC's method of accounting as "accrual basis". Ms. Fogel had been instructed that, under the accrual method, if an expense is taken upon receipt of a bill, additional expenses cannot be taken for payments against that bill. Nevertheless, Ms. Fogel would record an expense

**[\*7]** when CVC received a bill and, if the bill was not paid in full in the year of receipt, would also expense payments made on the bill in the following year. CVC's books reflect that, for at least some categories of expenses in some years, CVC expensed bills upon receipt and later expensed payments made against outstanding balances.[3] Considered alongside Ms. Fogel's testimony, the excerpts of CVC's 2008 books that are in the record suggest that she may have recorded entries in a manner consistent with the cash method of accounting during the latter half of 2008.

Before Dr. Isaacs hired Ms. Fogel, Angela Lopez worked as EVC's and CVC's bookkeeper. In that role, Ms. Lopez was responsible for depositing payroll tax for EVC's employees, but she did not do so. At around the same time, she made the same omission at Wexley Medical Clinic, which was operated by Dr. Lilia Wexley and her daughter, Dr. Victoria Wexley, Dr. Isaacs' fiance, who had referred Ms. Lopez to Dr. Isaacs. Contrary to EVC's rules, Ms. Lopez removed two boxes of documents from the clinic and took them to her home. Dr. Isaacs went with the police to Ms. Lopez's home three times in efforts to recover the

---

[3]The record contains only very limited excerpts from CVC's books. We cannot discern from these documents whether CVC followed the practice of expensing both bills and payments consistently and/or for all categories of expenses.

[*8] missing records. When Ms. Lopez finally returned some records to Dr. Isaacs, he discovered that they were for another doctor's clinic. Ms. Lopez left CVC's books in disarray and riddled with inaccuracies. CVC ultimately hired Ms. Fogel on the recommendation of its accountants after Ms. Lopez went missing for two weeks.

Dr. Isaacs' Fossil Donations

On or about December 29, 2006, Dr. Isaacs donated four fossil trilobites to the California Academy of Sciences (CAS), a section 501(c)(3) organization. On or about December 31, 2007, he donated eight fossil trilobites to CAS. CAS is a qualified organization within the meaning of section 170(c).

Dr. Isaacs filed Forms 8283, Noncash Charitable Contributions, with his 2006 and 2007 Federal income tax returns. On each form, in Part IV, "Donee Acknowledgment", an individual signed on behalf of CAS to acknowledge that CAS was a qualified organization under section 170(c) and that CAS had received Dr. Isaacs' donation on December 31 of the relevant tax year. Dr. Isaacs also included with his 2006 and 2007 returns letters from Jean F. DeMouthe, CAS' senior collections manager for geology, acknowledging the donations. These letters incorporated by reference separate correspondence from Dr. Isaacs describing the donated fossils. Neither the acknowledgments on Forms 8283 nor

[*9] the letters nor Dr. Isaacs' incorporated correspondence stated whether CAS had provided goods or services in exchange for the gifts.

Both of Dr. Isaacs' Forms 8283 bear the signature "Jeffrey R. Marshall" in Part III, "Declaration of Appraiser". Dr. Isaacs called Jeffrey Robert Marshall as a witness at trial. The Court accepted Mr. Marshall as an expert in the valuation of fossils over respondent's objection.[4]

Mr. Marshall identified the signature on Dr. Isaacs' 2006 Form 8283 as his own. He did not, however, recall signing it. He likewise identified his signature on Dr. Isaacs' 2007 Form 8283 but could not recall signing the form.

Mr. Marshall similarly identified his signature on two letters, dated December 31, 2006 and 2007, that purported to be appraisals of the fossils Dr. Isaacs donated to CAS in 2006 and 2007. But Mr. Marshall did not write or even recognize the letters, and as Dr. Isaacs offered no testimony from any other expert

---

[4]Mr. Marshall has collected fossils since his youth. He studied earth science at Santa Barbara City College and has taught earth science classes, mostly to high school students. He has operated 21 different retail stores, including up to 5 at any one time, specializing in fossil sales over the last 40 years. Mr. Marshall's business requires that he set prices for the fossils he sells. Over the years he has sold thousands of fossils at prices ranging from $1 to $2 million. Mr. Marshall and Dr. Isaacs share an enthusiasm for trilobite fossils, and Mr. Marshall has appraised such fossils for Dr. Isaacs at his request. Other than for Dr. Isaacs, Mr. Marshall has never prepared a formal appraisal for tax purposes. Before the trial in this case, he had never testified concerning an appraisal he had made.

**[*10]** as to the letters' author, we did not admit them into evidence.[5] Dr. Isaacs

did not offer any other purported appraisals of the donated fossils.

CVC's and Dr. Isaacs' Tax Returns

CVC timely filed Forms 1120S for tax years 2006, 2007 and 2008, claiming

deductions for, inter alia, the following business expenses:

| Expense | 2006 | 2007 | 2008 |
|---|---|---|---|
| Ancillary | $152,676 | $100,626 | --- |
| Lab fees | 47,009 | 22,817 | $64,373 |
| Medical supplies | 73,195 | 169,094 | 266,258 |
| Office overhead | --- | 100,000 | --- |
| Professional services | 6,591 | 13,733 | 74,686 |

CVC reported net ordinary business losses of $72,858 for 2006, $53,359 for 2007,

and $275 for 2008.

---

[5]Dr. Isaacs admitted during trial that he had written the letters himself and presented them to Mr. Marshall for signature. He did not, however, make this admission under oath during his testimony but rather after he had been excused as a witness, during a colloquy with the Court. As the admission was not evidence, we make no factual finding concerning it. See, e.g., Henry Glass & Co. v. Commissioner, 34 T.C. 954, 967 (1960) (noting that counsel's comments during opening statement were not evidence); Kennedy v. Commissioner, T.C. Memo. 1958-139, 17 T.C.M. (CCH) 716, 718 (1958) ("Assertions in opening statements, in arguments, or in briefs are not evidence, and, while helpful where there is sufficient evidence in support of the contentions made, cannot be taken to supply evidence which is lacking.").

[*11] Dr. Isaacs timely filed Forms 1040, U.S. Individual Income Tax Return, for tax years 2006, 2007, and 2008. He claimed deductions for passthrough losses from CVC of $53,677 for 2006 and $47,532 for 2007 but did not report any passthrough gain or loss from CVC for 2008.[6]

Dr. Isaacs also claimed deductions for noncash charitable contributions. For 2006 he claimed a $85,894 deduction on the basis of a $136,500 noncash contribution and an $11,719 carryover from a prior year. For 2007 he claimed a $52,361 deduction on the basis of a $109,800 noncash contribution and a $62,575 carryover from a prior year. For 2008 he claimed a $14,548 deduction on the basis of cash contributions totaling $500 and a $120,309 carryover from a prior year.

On September 22, 2011, respondent mailed a notice of deficiency to Dr. Isaacs determining adjustments to his income for tax years 2006, 2007, and 2008. These adjustments included, among other things, disallowance of Dr. Isaacs' 2006 and 2007 charitable contribution deductions, disallowance of a carryover noncash charitable contribution deduction for 2008, and disallowance of certain passthrough deductions for CVC's expenses for 2006, 2007, and 2008. Dr. Isaacs

---

[6]The Schedules K-1, Shareholder's Share of Income, Deductions, Credits, etc., that CVC should have issued to Dr. Isaacs for 2006 and 2007 and that would have included basis information, are not included, nor is other evidence to answer this question included, in the record. The record similarly does not disclose why Dr. Isaacs did not report any passthrough loss for 2008.

**[*12]** timely petitioned this Court on December 22, 2011, with respect to all three tax years.

Respondent's Examination

Revenue Agent Maria Rodriguez (RA Rodriguez), who holds a bachelor of science degree in accounting and a master's degree in taxation, examined CVC's expenses at the request of respondent's counsel after this case was filed. She reviewed numerous documents that Dr. Isaacs provided, including Quickbooks summary pages, invoices, and canceled checks. Dr. Isaacs did not provide RA Rodriguez with a complete set of books or a general ledger for CVC. Some of the invoices he did provide were directed to EVC, not CVC, and some of the checks bore notations on their memo lines indicating that they represented expenses of EVC. Dr. Isaacs also provided some Quickbooks journal entries for EVC, but he did not provide a complete set of books with which RA Rodriguez could reconcile the journal entries.

When RA Rodriguez reviewed CVC's Quickbooks summary pages, she noted that there were payments reflected on summaries of CVC's expenses which were in her opinion inconsistent with CVC's representation on its tax return that it followed the accrual method of accounting. For some categories of expenses, most of the items on the Quickbooks summary pages were payments, with only a

[*13] single, large expense accrued at yearend. Without a full set of books, RA Rodriguez could not reconcile CVC's payables with its tax returns or determine the year-to-year changes in its payables. Because she concluded she could not verify the accuracy of entries on the Quickbooks summary pages or journal entries and because she did not have a complete copy of CVC's books, RA Rodriguez concluded that she would not rely upon the Quickbooks excerpts that Dr. Isaacs had provided. She further concluded that the cash receipts and disbursements method of accounting would clearly reflect CVC's income.

Relying solely on source documents such as invoices and canceled checks, RA Rodriguez recomputed CVC's expenses on a cash basis for each tax year at issue. She disallowed expenses for which Dr. Isaacs provided only journal entries but no source documents. She likewise disallowed accrued expenses for which Dr. Isaacs could not provide proof of payment during that taxable year. Since returns for 2009 or other taxable years were not under audit, she apparently did not make any correlative adjustments for other taxable years. CVC's books and source documents indicated that it regularly transacted with the payees on two of these disallowed accrued expenses, Antech and Miller & Co., but payments to them did not follow any regular pattern in terms of either frequency or amount.

**[\*14]** <u>Parties' Concessions</u>

In a stipulation of settled issues[7] and on the basis of evidence adduced at

---

[7]In the stipulation of settled issues (SOSI), by each conceding various amounts the parties entirely resolved respondent's determinations of unreported income and partially resolved respondent's disallowances of deductions. The original SOSI was filed with the Court at the calendar call before trial and bears both parties' signatures. The SOSI is internally inconsistent with respect to the amounts remaining in dispute for 2008; different sets of numbers appear in paragraphs 11 and 12. We resolve that inconsistency on the basis of the stipulation of facts, the amounts stated in which correspond to and corroborate the set of numbers in paragraph 11 of the SOSI.

Making the request for the first time in his reply brief, Dr. Isaacs asks the Court to issue an order modifying the SOSI to reduce the amounts he conceded for each of the three years to $12,141 per year, a total of $36,423. He asks the Court to do this to "accurately reflect[] the actual amounts Petitioner should be conceding versus the amount imposed upon him by the unfortunate circumstance of a person that went crazy doing her bookkeeping job."

Stipulations should be enforced according to their terms "unless manifest injustice would result." <u>Bail Bonds by Marvin Nelson, Inc. v. Commissioner</u>, 820 F.2d 1543, 1547 (9th Cir. 1987), <u>aff'g</u> T.C. Memo. 1986-23. Although Rule 91(e) authorizes a party to move for modification of or relief from a stipulation, this Court generally will not consider an issue first raised in a reply brief. <u>Roberts v. Commissioner</u>, 141 T.C. 569, 583 n.20 (2013). Respondent has had no opportunity to respond to Dr. Isaacs' request, and as an attempt to vitiate the parties' settlement, that request is highly prejudicial to respondent as well as untimely. Accordingly, we will not consider it. <u>See id.</u> (refusing to consider the taxpayer's liability for a sec. 6662(a) negligence penalty when the penalty was first raised in the Commissioner's reply brief); <u>see also</u> <u>Kansky v. Commissioner</u>, T.C. Memo. 2007-40, 93 T.C.M. (CCH) 921, 924 (2007) (rejecting the taxpayer's argument that he had shifted the burden of proof to the Commissioner where the taxpayer first raised the argument in his reply brief).

[*15] trial,[8] the parties each conceded portions of the deductions for CVC's

expenses that respondent disallowed in the notice of deficiency. The amounts of

deductions for CVC's expenses remaining in dispute after these concessions

(disputed expenses), which are the only amounts addressed in this opinion, are as

follows:

| Expense | 2006 | 2007 | 2008 |
|---|---|---|---|
| Ancillary expenses | $104,400 | --- | --- |
| Lab fees | 6,504 | $1,727 | $25,865 |
| Office overhead | --- | 100,000 | --- |
| Medical supplies | --- | --- | 135,431 |
| Professional fees | --- | --- | 12,955 |

OPINION

As a general matter, the Commissioner's determination of a taxpayer's

liability for an income tax deficiency is presumed correct, and the taxpayer bears

the burden of proving that the determination is improper. See Rule 142(a); Welch

---

[8]Petitioner offered two checks, which we admitted as Exhibits 35-P and 36-P, to substantiate additional expenses for lab fees for 2006 and 2007. Petitioner represented that he had not previously provided these checks to respondent. In his posttrial brief respondent acknowledges that the 2007 check was newly provided and concedes a deduction for the amount of that check, $7,186, reducing the 2007 lab fees in dispute to $1,727. He states, however, that he had already received and conceded a $792 deduction for the amount of the 2006 check before trial. Petitioner does not contest respondent's statement in his reply brief, so we will accept this statement as accurate and refrain from double-counting the 2006 check.

**[\*16]** <u>v. Helvering</u>, 290 U.S. 111, 115 (1933). In particular, the taxpayer bears the burden of proving his entitlement to any claimed deduction. <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992). A "taxpayer must be able to point to some particular statute to justify his deduction and establish that he comes within its terms." <u>Roberts v. Commissioner</u>, 62 T.C. 834, 836 (1974).

I.    <u>Charitable Contributions</u>

A taxpayer may deduct any charitable contribution made during the taxable year, but only if the contribution is "verified under regulations prescribed by the Secretary."[9] Sec. 170(a)(1). For a noncash contribution of property, in general, the amount of the allowed deduction is the contributed property's fair market value at the time of contribution. Sec. 1.170A-1(c)(1), Income Tax Regs. The property's value also determines the applicable substantiation requirements. Section 170 sets three value thresholds relevant here.

First, for all contributions of $250 or more, a taxpayer generally must obtain a contemporaneous written acknowledgment from the donee.[10] Sec. 170(f)(8)(A).

---

[9]A "charitable contribution" is a contribution or gift for the use of a donee identified in sec. 170(c). Sec. 170(c). The parties have stipulated that CAS is a qualified organization under sec. 170(c), so Dr. Isaacs' fossil donations were charitable contributions within the meaning of the statute.

[10]This requirement does not apply "if the donee organization files a return,

(continued...)

**[\*17]** An acknowledgment is contemporaneous if the donee provides it on or before the earlier of the date on which the taxpayer files a return for the year of the contribution or the due date, including extensions, for filing that return. Sec. 170(f)(8)(C). The acknowledgment must: (1) include "a description (but not value) of any property other than cash contributed"; (2) state whether the donee provided any goods or services in exchange for the gift; and (3) include a description and good-faith estimate of the value of any goods or services the donee provided. Sec. 170(f)(8)(B); sec. 1.170A-13(f)(2), Income Tax Regs.

Second, for noncash contributions in excess of $500, a taxpayer must maintain reliable written records with respect to each donated item. Sec. 170(f)(11)(A) and (B); sec. 1.170A-13(b)(2) and (3), Income Tax Regs. These records must include, inter alia: (1) the approximate date and manner of the property's acquisition; (2) a description of the property in detail reasonable under the circumstances; (3) the property's cost or other basis; (4) the property's fair market value at the time of contribution; and (5) the method by which its fair

---

[10](...continued)
on such form and in accordance with such regulations as the Secretary may prescribe, which includes the information" required to be included in a contemporaneous written acknowledgment. See sec. 170(f)(8)(D). Dr. Isaacs has not argued, and the record contains no evidence, that CAS filed a return satisfying sec. 170(f)(8)(D).

[*18] market value was determined. Sec. 1.170A-13(b)(2)(ii)(B), (C) and (D), (3)(i)(A) and (B), Income Tax Regs.

Third, for noncash contributions of property with a claimed value of $5,000 or more, a taxpayer must--in addition to satisfying both sets of requirements described above--obtain a "qualified appraisal" of the donated item(s) and attach to his tax return a fully completed appraisal summary on Form 8283. Sec. 170(f)(11)(C); Jorgenson v. Commissioner, T.C. Memo. 2000-38, 79 T.C.M. (CCH) 1444, 1450 (2000) ("The IRS has prescribed Form 8283 to be used as the appraisal summary."); sec. 1.170A-13(c)(2), Income Tax Regs. Generally, an appraisal is "qualified" if it (1) is prepared no more than 60 days before the contribution date by a "qualified appraiser", and (2) incorporates specified information, including a statement that the appraisal was prepared for income tax purposes, a description of the valuation method used to determine the contributed property's fair market value, and a description of the specific basis for the valuation. Sec. 1.170A-13(c)(3)(i) and (ii), Income Tax Regs.

Because the values Dr. Isaacs claimed for the fossils donated to CAS on his 2006 and 2007 tax returns--$136,500 and $109,800, respectively--exceeded $5,000, he was obliged to meet all three sets of requirements outlined above. He satisfied none of them.

**[\*19]** Beginning with the highest applicable value threshold, Dr. Isaacs failed to establish that he obtained qualified appraisals of the donated fossils as required by section 170(f)(11)(C). Although he sought to introduce purported appraisals signed by Jeffrey Marshall, whom the Court accepted as an expert in fossil valuation, Mr. Marshall denied that he had written these purported appraisals, and we did not admit them into evidence. We need not decide whether Mr. Marshall was a "qualified appraiser" within the meaning of the regulations because, even if he was, Dr. Isaacs introduced no evidence that Mr. Marshall rendered any appraisals of the donated fossils for him.[11] Dr. Isaacs offered no evidence of any other appraisals of the donated fossils that could satisfy the statutory requirement.

---

[11]In the course of representing himself, but not while on the witness stand, Dr. Isaacs admitted that he had written the appraisals bearing Mr. Marshall's signature. Dr. Isaacs does not argue that he himself was a qualified appraiser, such that the letters he drafted could be qualified appraisals. We note, however, that the applicable regulation specifically excludes "[t]he donor or the taxpayer who claims or reports a deduction under section 170 for the contribution of the property that is being appraised" from the definition of "qualified appraiser". See sec. 1.170A-13(c)(5)(i)(C), (iv)(A), Income Tax Regs.

**[\*20]** Hence, he was not entitled to deductions for his charitable contributions.[12] See sec. 170(f)(11)(A)(i), (C).

Even if Dr. Isaacs had obtained qualified appraisals of the fossils donated in 2006 and 2007, however, he would still be precluded from deducting the donations because he failed to satisfy the substantiation requirements for noncash contributions exceeding $500. See sec. 1.170A-13(b)(2) and (3), Income Tax Regs. For 2006 and 2007 Dr. Isaacs produced records that included reasonably detailed descriptions and purported fair market values of the donated fossils--to wit, the cover letters he provided to CAS along with the fossils. But he introduced no evidence other than his Forms 8283 of the approximate dates and manner of the fossils' acquisition, their costs or other bases, or the method by which their purported fair market values were determined. See sec. 1.170A-13(b)(2)(ii)(D), (3)(i)(A), (B), Income Tax Regs. (mandating, as a prerequisite to deduction of a noncash charitable contribution, that the taxpayer maintain records containing each of these items of information with respect to the contributed property).

---

[12]Although we have held that the requirements of the charitable contribution regulations may be met through substantial, rather than strict, compliance, see Bond v. Commissioner, 100 T.C. 32, 40-42 (1993), we have also held this substantial compliance doctrine inapplicable to the statutory qualified appraisal requirement, see Hewitt v. Commissioner, 109 T.C. 258, 263-264 (1997), aff'd without published opinion, 166 F.3d 332 (4th Cir. 1998).

[*21] Alone, the Forms 8283, as part of Dr. Isaacs' income tax returns, do not satisfy the recordkeeping requirement. See Roberts v. Commissioner, 62 T.C. at 837 (characterizing an income tax return as "merely a statement of the * * * [taxpayer's] claim").

Finally, even had Dr. Isaacs satisfied the substantiation requirements for contributions in excess of both $5,000 and $500, we would still sustain respondent's disallowance of his claimed deductions because he failed to obtain a satisfactory contemporaneous written acknowledgment, as required for a contribution exceeding $250.[13] See sec. 170(f)(8)(A). Jean F. DeMouthe, on behalf of CAS, acknowledged Dr. Isaacs' contributions in writing, and these letters, each dated for the date on which Dr. Isaacs made the contribution acknowledged therein, were contemporaneous as required by section 170(f)(8)(A) and (C). Under section 170(f)(8)(B)(ii), however, the letters could suffice as contemporaneous written acknowledgments only if they stated whether CAS had provided any goods or services in exchange. See Schrimsher v. Commissioner, T.C. Memo. 2011-71, slip op. at 8-9 (citing the legislative history of section

---

[13]Because Dr. Isaacs did not satisfy the substantiation requirements for a contribution exceeding $250, we need not assess whether Dr. Isaacs met the requirements for relief under sec. 170(f)(11)(A)(ii)(II), which excuses, inter alia, failure to obtain a qualified appraisal where such failure "is due to reasonable cause and not to willful neglect."

[*22] 170(f)(8)(B) for the proposition that "even if the * * * [donee] actually provided no consideration for the contribution, the written acknowledgment must say so in order to satisfy the requirement of section 170(f)(8)(B)(ii)"). Neither letter includes such a statement.

Because Dr. Isaacs failed to obtain a qualified appraisal and satisfy the relevant substantiation requirements, respondent properly disallowed his claimed charitable contribution deductions for 2006 and 2007, as well as his claimed carryover deduction for 2008.[14]

II.     Disputed Expenses

Respondent disallowed various deductions for business expenses CVC claimed on its returns and consequently, in the notice of deficiency, reduced Dr. Isaacs' passthrough losses for 2006 and 2007 and increased his passthrough

---

[14]Sec. 170(b)(1)(A) and (d)(1) caps an individual taxpayer's charitable contribution deduction for a given tax year but permits a limited carryover of any excess deduction to each of the five succeeding tax years, subject for each such year to the cap and carryover limitations. Dr. Isaacs' 2006 return reflects a carryover deduction from 2005 of $11,719. He similarly carried amounts forward to his 2007 and 2008 returns. Respondent adjusted to zero Dr. Isaacs' deduction for each of the years at issue, necessarily disallowing any amounts of these deductions attributable to the pre-2006 contribution that generated the reported carryover from 2005. Dr. Isaacs introduced no evidence concerning this earlier charitable contribution, so we must sustain respondent's disallowance of any carryover deduction for it in the years at issue along with the deductions attributable to Dr. Isaacs' 2006 and 2007 fossil donations to CAS.

[*23] income for 2008. See sec. 162(a) (permitting deduction of ordinary and necessary business expenses); sec. 1366(a)(1) (providing that an S corporation shareholder shall take into account his pro rata share of, inter alia, the S corporation's deductions in calculating his tax for his taxable year in which the S corporation's taxable year ends). Respondent did not articulate a basis for the deductions' disallowance in the notice or in his answer to Dr. Isaacs' petition.

At trial, however, respondent contended that Dr. Isaacs had failed to substantiate the disputed expenses underlying the disallowed deductions and that in any event, for some of the disputed expenses, CVC improperly accrued these expenses at yearend despite otherwise maintaining its books on a cash basis.

A taxpayer must keep books or records that substantiate the expenses underlying each deduction claimed on his or her return. Sec. 6001; Roberts v. Commissioner, 62 T.C. at 836. Claiming a deduction on an income tax return is not sufficient to substantiate the underlying expense. Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979). Rather, as previously noted, an income tax return "is merely a statement of the * * * [taxpayer's] claim * * * ; it is not presumed to be correct." Roberts v. Commissioner, 62 T.C. at 837.

Similarly, unless corroborated by other evidence, an entry on a taxpayer's books generally will not suffice to substantiate an expense. See, e.g., Olive v.

[*24] Commissioner, 139 T.C. 19, 32-33 (2012) ( finding that general ledgers, alone, did not suffice to substantiate the taxpayer's costs of goods sold); Ohana v. Commissioner, T.C. Memo. 2014-83, at *20 (holding that Quickbooks profit and loss detail charts did not alone, without more, suffice to substantiate the taxpayer's claimed expenses); Lustman v. Commissioner, T.C. Memo. 1960-116, 19 T.C.M. (CCH) 617, 621-622 (1960) (concluding that noncontemporaneous book entries did not suffice to substantiate claimed interbusiness transactions where no corresponding entry appeared on the other business' books), aff'd, 322 F.2d 253 (3d Cir. 1963).

Under Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930), if a taxpayer claims a deduction but cannot fully substantiate the expense underlying the deduction, the Court may generally approximate the allowable amount, bearing heavily against the taxpayer whose inexactitude in substantiating the amount of the expense is of his own making. The Court must have some basis upon which to make its estimate, however, else the allowance would amount to "unguided largesse". Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957); accord Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985).

If a taxpayer's records are lost or destroyed because of circumstances beyond his control, the taxpayer may instead substantiate expenses with other

**[\*25]** credible evidence.  See <u>Malinowski v. Commissioner</u>, 71 T.C. 1120, 1124-1125 (1979).  Here again, although the Court generally may estimate amounts, any estimate must have a reasonable evidentiary basis.  See <u>Villarreal v. Commissioner</u>, T.C. Memo. 1998-420, 76 T.C.M. (CCH) 920, 921-922 (1998).

A. 2006 Lab Fees

Of CVC's claimed $47,009 lab fees deduction for 2006, $6,504 remains in dispute.  Except for Exhibit 35-P, <u>see</u> <u>supra</u> note 8, petitioner offered no documentary evidence to substantiate that these fees were ever incurred or paid.[15]  Dr. Isaacs testified, generally, that his understanding was that respondent had denied deductions for some lab fees despite his providing checks drawn on CVC's account(s) to substantiate them because notations on the checks indicated they were for expenses of EVC, not CVC.  Respondent's counsel never confirmed that Dr. Isaac's understanding of respondent's reasoning was correct.  Dr. Isaacs did

---

[15]Exhibits 14-P and 17-P consist of copies of invoices and canceled checks related to, respectively, CVC's 2008 lab fees expense and its 2008 professional services expense.  Exhibit 24-P consists of miscellaneous bank statements and canceled checks from one of CVC's accounts.  The bank statements are from 2007, and the canceled checks and invoices, not all of which are entirely legible, appear to be from 2007 and 2008.  No comparable evidence--other than Exhibit 35-P, an October 6, 2006, canceled check for $792, an amount which respondent conceded during the examination and shall be allowed as a sec. 162 deduction-- was submitted for 2006, and none of the Quickbooks summary pages or journal entries for 2006 in the record, Exhibits 8-P and 9-P, covers the lab fees expense.

**[\*26]** not introduce the checks he described or offer any other evidence concerning the disputed $6,504 of the claimed expense deduction.  We have no means of ascertaining the alleged checks' amounts or whether they paid expenses of EVC rather than CVC and no factual basis upon which to estimate an allowable expense.  See Williams, 245 F.2d at 560; Vanicek v. Commissioner, 85 T.C. at 742-743.  Dr. Isaacs failed to satisfy his burden of proof with respect to the 2006 lab fees, see Rule 142(a), and we will sustain respondent's determination concerning them.

B.    2006 Ancillary Expenses

Of CVC's claimed deduction for $156,676 of ancillary expenses for 2006, $104,400 remains in dispute.[16]  Neither petitioner nor respondent pointed to a particular source or explanation for $19,400 of the disputed amount, and no evidence concerning it was introduced.  Respondent's determination is presumed correct, and Dr. Isaacs bears the burden of disproving it.  See Rule 142(a); Welch

---

[16]On brief petitioner claims that the SOSI incorrectly stated the amount of 2006 ancillary expenses remaining in dispute and that the correct amount is $80,574.  Petitioner offers no facts to support this claim, and respondent maintains that the amount in the SOSI is correct.  Absent any factual basis on which to question them, we proceed using the dollar amount that the parties stipulated in the SOSI.

**[*27]** v. Helvering, 290 U.S. at 115. He failed to do so with respect to this $19,400 of ancillary expenses, so we will sustain respondent's determination to that extent.

The $85,000 balance of the amount in dispute consists of a single expense allegedly incurred on December 30, 2006. CVC's 2006 Quickbooks summary page for ancillary expenses lists, as a debit, an $85,000 expense as "Due to/Due from CVC". A December 30, 2006, adjusting journal entry links this $85,000 expense to the "Retail Pet Food & Supplies" account and reads "To record Transfer T" under the memo heading. This debit item is matched with a credit item in the same amount, with the same memo information, to the "Due to/Due from CVC" account. A corresponding adjusting journal entry for EVC for the same amount on the same date lists a debit to "Due to/from CVC" and a credit to "Retail Pet Food & Supplies" and reads "To charge Encino for..." under the memo heading.

Dr. Isaacs testified that these journal entries reflect reimbursement by CVC to EVC for inventory items ordered in bulk and paid for by EVC but distributed to CVC during the year pursuant to the interoffice policy. Respondent stipulated the clinics' receipt of discounts on veterinary supplies ordered in bulk. Dr. Isaacs

[*28] further testified that EVC had included in income reimbursements it received from CVC.

Respondent challenges CVC's deduction of this $85,000 alleged expense on two grounds.

### 1. Accounting Method

Dr. Isaacs testified that CVC never actually paid the $85,000 to EVC; rather, CVC's expense and EVC's income existed only as Quickbooks journal entries. Respondent contends that, although CVC's 2006 tax return indicates that it reported its income according to the accrual method of accounting, CVC was a cash method taxpayer. Therefore, respondent reasons, CVC was not entitled to deduct an $85,000 expense that it had not actually paid. See sec. 1.446-1(c)(1)(i), Income Tax Regs. (providing that a cash method taxpayer may deduct expenses only for the year in which they are actually paid).

### a. Burden of Proof

Section 446(b) allows the Commissioner to change a taxpayer's method of accounting if the taxpayer's chosen method of accounting does not clearly reflect income. The Commissioner has broad discretion in determining whether an accounting method clearly reflects income, and that determination is entitled to more than the usual presumption of correctness. Commissioner v. Hansen, 360

**[*29]** U.S. 446, 467 (1959); RECO Indus., Inc. v. Commissioner, 83 T.C. 912, 920 (1984).

But respondent has not made a determination pursuant to section 446(b) in this case. Neither the notice of deficiency nor respondent's answer purports to change CVC's method of accounting. Instead, on the basis of RA Rodriguez's pretrial recomputation of CVC's expenses on the cash method, respondent now advances the theory that CVC in fact used the cash method (not that it should be obliged to change to that method) as one justification for certain determinations in the notice of deficiency. The notice makes no reference to CVC's method of accounting. Indeed, it provides no rationale whatsoever for respondent's disallowance of passthrough losses from CVC but merely states that Dr. Isaacs' passthrough income and loss from CVC were adjusted "in accordance with the examination results of the S corporation return (Form 1120S) of which you are a shareholder."

Whatever quantum and form of evidence would ordinarily be required from respondent or petitioner to resolve this determination, we think it does not, in this case, reasonably include evidence sufficient to substantiate expenses underlying claimed deductions under a method of accounting different from the one indicated on CVC's return. Substantiating an expense under CVC's claimed accrual method

[*30] of accounting would require establishing that "all the events ha[d] occurred that establish the fact of the liability", that the amount could "be determined with reasonable accuracy", and that economic performance had occurred. See sec. 1.446-1(c)(1)(ii), Income Tax Regs. An invoice might suffice. Substantiating the expense under the cash method of accounting proposed by respondent, however, would require establishing that the expense was actually paid in the tax year for which the deduction was taken. See id. subdiv. (i). In that case, a canceled check might suffice, but an invoice, alone, would not.

Rebutting respondent's contention would require Dr. Isaacs to present different evidence. The contention therefore constitutes a "new matter", and respondent bears the burden of proof concerning it.[17] See Rule 142(a); Shea v. Commissioner, 112 T.C. 183, 197 (1999) ("[W]here a notice of deficiency fails to

---

[17]In contrast, respondent's contention that Dr. Isaacs failed to substantiate the disputed deductions is, at most, a new reason for the determinations concerning them in the notice of deficiency. See Rodriguez v. Commissioner, T.C. Memo. 2012-286, at *25 n.11, aff'd without published opinion, 551 Fed. Appx. 67 (4th Cir. 2014). The record reflects that respondent sought, and to some extent obtained, substantiation evidence from Dr. Isaacs during his audit of CVC and in advance of trial. Dr. Isaacs was neither surprised nor prejudiced in presenting evidence to substantiate his deductions. Because, absent surprise or substantial disadvantage to the taxpayer, we may affirm the Commissioner's determinations for reasons other than those stated in the notice of deficiency, petitioner retains the burden of proof with respect to substantiation. See Considine v. Commissioner, 74 T.C. 955, 964-966 (1980).

[*31] describe the basis on which the Commissioner relies to support a deficiency determination and that basis requires the presentation of evidence that is different than that which would be necessary to resolve the determinations that were described in the notice of deficiency, the Commissioner will bear the burden of proof regarding the new basis."); Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989) ("A new theory that is presented to sustain a deficiency is treated as a new matter when it * * * requires the presentation of different evidence."); see also German v. Commissioner, T.C. Memo. 1993-59, 65 T.C.M. (CCH) 1931, 1934 (1993) (where the Commissioner first proposed changing the taxpayers' method of accounting in his amended answer, holding that the Commissioner bore the burden of proving that the taxpayers' method did not clearly reflect income), aff'd without published opinion, 46 F.3d 1141 (9th Cir. 1995).

b.      Analysis

For four reasons, we conclude that respondent has not carried his burden of proof with respect to the 2006 tax year.

First, although mixed, the evidence in the record tends to show that CVC computed its income for tax purposes in accordance with the accrual method. Dr. Isaacs' testimony on this point cuts both ways: He testified that CVC did not maintain accounts receivable because its clients typically paid for services at the

[*32] time of performance, which would be consistent with both the cash and accrual methods of accounting if <u>all</u> customers were required to pay at the time of service. He also testified adamantly that CVC was on the accrual method. Notwith-standing Dr. Isaacs' testimony, CVC did report small opening and closing values for accounts receivable on Schedule L of its 2006 and 2007 Forms 1120S. CVC likewise reported opening and closing values for accounts payable.

We give less deference to labels such as that assigned here by CVC's checking the box for the accrual method on its 2006, 2007, and 2008 Forms 1120S.

> [W]hether a return is made on the accrual basis, or on that of actual receipts and disbursements, is not determined by the label which the taxpayer chooses to place upon it. The * * * inclusion in the returns of accrual items of receipts and disbursements appearing on petitioner's books, indicate the general and controlling character of the account * * * and support * * * [a] finding * * * that books and returns were on the accrual basis. [<u>Aluminum Castings Co. v. Routzahn</u>, 282 U.S. 92, 99 (1930).]

The inclusion in CVC's return of values for "accrual items of receipts and disbursements" indicates that CVC computed its income for tax purposes using the accrual method of accounting, not the cash method, although its books may have contained errors. <u>See id.</u> RA Rodriguez testified that she could not validate the values for accounts payable reported on CVC's returns because she did not receive

[*33] a complete set of books. But incomplete substantiation does not necessarily render a taxpayer's accounting method improper or demonstrate that a different method was in fact used.

Second, the record does not establish that for book purposes CVC was, as respondent alleges, a cash method taxpayer. RA Rodriguez testified, generally, that the Quickbooks expense summary pages Dr. Isaacs provided to her reflected a mix of payments and invoices, with expenses accrued only at yearend. In partial alignment with that testimony, CVC's 2006 Quickbooks ancillary expenses summary reflects both checks paid and bills received, albeit throughout the year rather than only at yearend. RA Rodriguez found this mix of payments and bills to be inconsistent with the accrual method of accounting.[18] Other than an unrelated

_____

[18]Sec. 446(a) provides that "the taxpayer's method of computing taxable income * * * [shall] conform to the taxpayer's method of accounting for book purposes." Sunoco, Inc. v. Commissioner, T.C. Memo. 2004-29, 87 T.C.M. (CCH) 937-25, 944 (2004). CVC's tax return indicates it computed taxable income on the accrual method, so we would expect CVC's books to be kept on the accrual method as well. But the conformity rule of section 446(a) is not an absolute requirement. See FPL Grp., Inc. v. Commissioner, 115 T.C. 554, 562-563 (2000). A taxpayer may maintain his or her books on one method and compute taxable income using another method, provided that he or she maintains "a reconciliation of any differences between * * * [the taxpayer's] books [of account] and * * * [the taxpayer's] return." See sec. 1.446-1(a)(2), (4), Income Tax Regs. A taxpayer maintaining his or her books on the cash method for financial purposes could convert from the cash method to the accrual method for tax purposes by means of adjusting journal entries to receivables and payables at

(continued...)

[*34] journal entry described supra, the ancillary expenses summary page is the

only portion of CVC's 2006 books in the record. It is unclear from that summary

what method of accounting CVC's bookkeeper was purporting to use for these

expenses, but the summary's inclusion of invoices and bills belies respondent's

contention that CVC in fact maintained its books on the cash method of

accounting for 2006.

Third, section 446(b) does not permit the Commissioner to change a

taxpayer's method of accounting from one incorrect method to another incorrect

method. Prabel v. Commissioner, 91 T.C. 1101, 1112 (1988), aff'd, 882 F.2d 820

(3d Cir. 1989). And as a general matter, it is improper for a taxpayer to compute

its income on one method and its expenses on another:

> [A] taxpayer who uses the cash method of accounting in computing
> gross income from his trade or business shall use the cash method in
> computing expenses of such trade or business. Similarly, a taxpayer
> who uses an accrual method of accounting in computing business
> expenses shall use an accrual method in computing items affecting

---

[18](...continued)
yearend. Cf. Applied Commc'ns, Inc. v. Commissioner, T.C. Memo. 1989-469, 57 T.C.M. (CCH) 1473, 1475, 1479 (1989) (noting that taxpayer converted from accrual to cash method by means of adjusting journal entries but sustaining the Commissioner's determination that the cash method did not clearly reflect the taxpayer's income). Although CVC made such a yearend adjusting journal entry to its ancillary expenses, the evidence does not establish whether this journal entry operated to convert CVC's accounts from cash to accrual.

[*35] gross income from his trade or business.  [Sec. 1.446-1(c)(1)(iv)(a), Income Tax Regs.]

On the income side, other than Dr. Isaacs' ambiguous testimony, CVC's reporting of opening and closing balances for accounts receivable on its tax return constitutes the only available evidence as to CVC's method of accounting for its 2006 receipts.  Because RA Rodriguez examined only CVC's expenses, she could not have recomputed CVC's receipts on the cash method along with its expenses. Respondent has allowed CVC to take accrued receipts into income but would disallow deductions for accrued expenses.  Such disparate treatment of receipts and expenses would not clearly reflect CVC's 2006 income.  See id.

Fourth and finally, it is undisputed that CVC has reported using the accrual method of accounting on its income tax returns since its incorporation. Respondent has apparently left CVC's use of the accrual method undisturbed for tax years preceding 2006.  If, for 2006 through 2008, CVC's income were to be instead computed for tax purposes on the cash method, this would represent a change in method of accounting.  See Bank One Corp. v. Commissioner, 120 T.C. 174, 282 (2003) (defining a method of accounting as "the consistent treatment of any recurring, material item, whether that treatment be correct or incorrect"), aff'd

[*36] in part, vacated in part on other grounds and remanded sub nom. J.P. Morgan Chase & Co. v. Commissioner, 458 F.3d 564 (7th Cir. 2006).

Under the Code, in general, a change in method of accounting can occur in one of three ways. First, section 446(b) authorizes the Commissioner to compel a change in method of accounting under certain circumstances. Second, a taxpayer may request, pursuant to section 446(e), the Commissioner's permission to change its method of accounting. And third, a taxpayer may simply, in derogation of section 446(e), begin filing tax returns under a new method of accounting. In that third circumstance, "the Commissioner can assert section 446(e) and require the taxpayer to abandon the new method of accounting and to report taxable income using the old method of accounting." Capital One Fin. Corp. v. Commissioner, 130 T.C. 147, 155 (2008), aff'd, 659 F.3d 316 (4th Cir. 2011); accord Sunoco, Inc. v. Commissioner, T.C. Memo. 2004-29, 87 T.C.M. (CCH) 937-25, 945 (2004). But the Commissioner could, instead, leave the change undisturbed. Sunoco, Inc. v. Commissioner, 87 T.C.M. (CCH) at 945; see also Barber v. Commissioner, 64 T.C. 314, 315-316, 319 (1975). In the absence of remedial action by the Commissioner, the taxpayer's consistent use of a new method of accounting over a sufficient period accomplishes a change in method of accounting notwithstanding the taxpayer's failure to seek and obtain the Commissioner's consent. See

[*37] Huffman v. Commissioner, 126 T.C. 322, 354 (2006), aff'd, 518 F.3d 357 (6th Cir. 2008).

Respondent has not exercised his authority under section 446(b) to change CVC's method of accounting for the years at issue, and there is no evidence that he did so for prior years. There is likewise no evidence that for 2006 CVC sought or obtained consent under section 446(e) to change its method of accounting. Finally, as concluded above, the evidence indicates that CVC computed its income for tax purposes on the accrual method and does not indicate that CVC used the cash method for book purposes. For the foregoing reasons, we will not sustain respondent's disallowance of the claimed $85,000 of ancillary expenses on the basis that it represents an accrued expense rather than one actually paid in 2006.

2.    Substantiation

Rejecting as inadequate the excerpts from CVC's and EVC's Quickbooks entries, respondent further contends that Dr. Isaacs did not substantiate the claimed $85,000 of ancillary expenses. The log that tracked inventory movement between EVC and CVC would perhaps have been the best possible substantiation for this expense, but Dr. Isaacs testified that he could not provide this log because he no longer had it.

**[\*38]** Yet Dr. Isaacs established that CVC's former bookkeeper, Ms. Lopez, failed to deposit payroll taxes, generally left the clinics' books in disarray, and--as is crucial here--stole business records and refused to return them. Ms. Lopez's egregious conduct was not reasonably foreseeable. Because some of CVC's business records were lost because of circumstances beyond Dr. Isaacs' control, he was entitled to substantiate expenses with other credible evidence. See Malinowski v. Commissioner, 71 T.C. at 1124-1125.

To that end, Dr. Isaacs described the reason for the claimed $85,000 of ancillary expenses and introduced the interoffice policy to support that explanation. He offered uncontroverted testimony that EVC included the $85,000 in income for 2006, and he provided corresponding offsetting journal entries for CVC and EVC that are consistent with his testimony. These items may not be the best possible evidence for the $85,000 of ancillary expenses but they do constitute some evidence. Although uncorroborated book entries generally will not suffice to substantiate an expense, see, e.g., Olive v. Commissioner, 139 T.C. at 32-33, Dr. Isaacs offered other evidence to corroborate CVC's Quickbooks summary. We found Dr. Isaacs' testimony credible, and we accordingly find that he has substantiated the $85,000 of ancillary expenses by a preponderance of the

**[\*39]** evidence.  See Cohan v. Commissioner, 39 F.2d at 544.  We will allow a deduction for it.

C.    2007 Lab Fees

Of CVC's claimed $22,817 lab fees deduction for 2007, after respondent's pretrial and posttrial concessions, see supra note 8, $1,727 remains in dispute.  As with the disputed lab fees for 2006, Dr. Isaacs offered no evidence to demonstrate that these fees were ever incurred.  Dr. Isaacs did introduce miscellaneous bank statements and canceled checks, some of which appear to bear 2007 dates.  But he made no attempt to identify a check or checks that would account for the disputed $1,727 expense, and the Court has not found any such check(s) in its own review of the evidence.  The bank statements merely list checks paid without identifying the payees.

On brief Dr. Isaacs contends that the $1,727 expense represents a fee paid to Antech and that a deduction for the expense should be allowable notwithstanding the absence of any substantiation evidence because:  (1) he has provided evidence of numerous other fees CVC paid to Antech throughout the year; and (2) Ms. Lopez stole some of CVC's business records and left its books in general disarray.  Both of these premises are incorrect.

**[*40]** First, although the <u>Cohan</u> rule permits us to estimate the amount of an allowable expense, we must have some factual basis for doing so. <u>See</u> <u>Williams</u>, 245 F.2d at 560; <u>Vanicek v. Commissioner</u>, 85 T.C. at 742-743. Dr. Isaacs has pointed to no supporting facts, only to those reasons why he has no facts. That CVC paid other fees to Antech does not mean that it paid this particular lab fee to Antech, and the Court can divine no pattern, in terms of timing or amount, in the Antech fees that Dr. Isaacs has substantiated.

Second, CVC's loss of business records due to events beyond its control entitles Dr. Isaacs to substantiate the claimed expense with other credible evidence. Yet no document or testimony in the record supports the amount claimed. Neither Dr. Isaacs nor any other witness testified concerning the date, amount, purpose, or method of payment for this specific claimed expense.

Dr. Isaacs has not satisfied his burden of proof with respect to the 2007 lab fees, <u>see</u> Rule 142(a), and we will sustain respondent's determination concerning them.

D.     <u>2007 Office Overhead</u>

Respondent disallowed in its entirety CVC's $100,000 deduction for office overhead for 2007. Dr. Isaacs testified that this $100,000 expense consisted of a management fee paid by CVC to EVC for 2007, pursuant to the interoffice policy.

**[*41]** He acknowledged that CVC did not pay EVC a management fee in 2006 and did not report an expense for a management fee for 2008.  Dr. Isaacs explained that for 2007, rather than use yearend adjusting journal entries to reimburse EVC for bulk-ordered consumables transferred to CVC, he caused EVC to impose the management fee.  He further testified that--in contrast with the 2006 consumables reimbursement to EVC, which was accomplished through corresponding journal entries without actual payment--CVC actually paid EVC the $100,000 management fee.  He stated that EVC included this amount in income for 2007.

As with the consumables reimbursement payment for 2006, Dr. Isaacs introduced corresponding, offsetting journal entries for CVC and EVC that reflect a $100,000 debit to CVC on December 31, 2007, and a $100,000 credit to EVC (for "Misc Income") on the same date.  EVC's 2007 profit and loss statement includes a $100,000 line item for "Misc Income - Other".

To demonstrate that CVC in fact paid the $100,000 management fee to EVC, Dr. Isaacs produced a Quickbooks "Find Report" that lists checks paid by CVC to EVC from April 24, 2007, through October 31, 2008.  The check amounts listed total $103,000 rather than $100,000, with $51,000 paid in 2007 and the remaining $52,000 paid in 2008.

[*42]      1.      Substantiation

Respondent contends that the foregoing evidence is insufficient to substantiate the management fee claimed as a deduction on CVC's 2007 Form 1120S, as detailed on statement 3 itemizing claimed other deductions. He dismisses as "self-serving" Dr. Isaacs' testimony that EVC included the full $100,000 in income for 2007, and he contends that nothing ties the documented payments to the claimed office overhead deduction. We disagree.

During his testimony, Dr. Isaacs explained the nature of and basis for the management fee, and he introduced the interoffice policy, which addresses the fee. He further introduced journal entries for CVC and EVC that document an expense and corresponding receipt. Dr. Isaacs testified that EVC included the $100,000 management fee in income for 2007, and EVC's inclusion of that fee as income on its 2007 profit and loss statement supports his testimony. Dr. Isaacs' testimony also linked the payments to EVC recorded on CVC's books to the management fee.

Although this evidentiary showing may not represent the best possible evidence to substantiate the management fee, it is credible evidence. See Malinowski v. Commissioner, 71 T.C. at 1124-1125 (holding that a taxpayer whose records were lost because of circumstances beyond his control could

**[\*43]** substantiate expenses with other credible evidence). Furthermore, while uncorroborated book entries generally will not suffice to substantiate an expense, see, e.g., Olive v. Commissioner, 139 T.C. at 32-33, Dr. Isaacs offered evidence to corroborate CVC's book entry for the management fee. On the record before us, that evidence is uncontroverted. Accordingly, we conclude that Dr. Isaacs has satisfied his substantiation burden.[19]

---

[19]This Court has not so far expressly addressed whether the disputed expenses were "ordinary and necessary" as required for deduction under sec. 162(a). See Commissioner v. Lincoln Sav. & Loan Ass'n, 403 U.S. 345, 352 (1971) ("To qualify as an allowable deduction under § 162(a) * * * an item must (1) be 'paid or incurred during the taxable year,' (2) be for 'carrying on any trade or business,' (3) be an 'expense,' (4) be a 'necessary' expense, and (5) be an 'ordinary expense.'"). We have refrained from doing so in part because respondent has not specifically argued that the disputed expenses were not ordinary and necessary business expenses; rather, respondent's substantiation arguments focus strictly on gaps in CVC's documentation.

Moreover, we think it fairly obvious that lab fees and expenses for consumables such as vaccines, medications, and surgical supplies were "appropriate and helpful" to the business of operating a veterinary clinic, see Welch v. Helvering, 290 U.S. 111, 113 (1933), and that outsourcing laboratory services and purchasing supplies are "common or frequent occurrence[s]" in such a business, see Deputy v. du Pont, 308 U.S. 488, 495 (1940). The same could be said of the professional fees disputed for 2008. Small businesses routinely pay accountants and bookkeepers.

Management services, however, while certainly necessary to the operation of the business at issue here, are not so plainly an "ordinary" expense when provided by a third party. Indeed, if we analyze the management fee as a payment for the provision of management services, the evidence does not even establish that the expenses were a "common or frequent occurrence" at this particular clinic, let alone among businesses of its kind. See id. Dr. Isaacs testified that EVC did

(continued...)

**[\*44]**      2.      <u>Accounting Method</u>

Respondent further notes that, although CVC claimed a $100,000 deduction

for 2007, its own records show that it paid only $51,000 to EVC during that year.

We interpret this observation as alluding to respondent's more general contention

that CVC "is really a cash method taxpayer." For the same reasons described

<u>supra</u> part II.B.1, we decline to adopt this theory with respect to CVC's 2007 tax

year.

First, the record reflects that CVC computed its 2007 taxable income on the

accrual method. On its 2007 Form 1120S, consistent with Dr. Isaacs' testimony

that CVC used the accrual method, CVC reported opening and closing values for

---

[19](...continued)
not levy a management fee in 2006 or 2008. The explanation for this apparent
dichotomy is that the 2007 management fee was not, in reality, a management fee
but rather constituted reimbursement for the cost of consumables transferred
between the clinics. In other years these transfers had also been reimbursed but
were charged and booked under a different expense account. In 2006, for
instance, CVC booked an $85,000 consumables reimbursement as an ancillary
expense. <u>See</u> <u>supra</u> pp. 27, 37-38. In 2008 CVC booked an aggregate
consumables reimbursement of $138,561 as a medical supplies expense, allocating
the total amount among three subaccounts, for drugs, surgical supplies, and other
medical supplies. <u>See</u> <u>infra</u> p. 54. Analyzed in this context, the 2007 management
fee qualifies as an ordinary expense.

**[*45]** accounts receivable and accounts payable.[20] See Aluminum Castings Co., 282 U.S. at 99.

Second, the record does not establish that CVC computed its income for book purposes on the cash method. The record contains only two relevant excerpts from CVC's 2007 books: the $100,000 journal entry for the management fee on December 31, 2007, and the schedule of payments showing only $51,000 actually paid toward that amount during 2007. That CVC recorded the full $100,000 expense in the year in which the management fee was levied, before it had paid the full amount, suggests that it maintained its books on the accrual method during 2007. Cf. 1.446-1(c)(1)(i), Income Tax Regs. (stating that a cash method taxpayer may deduct an expense only when actually paid).

Third, CVC's tax return reflects that it computed its 2007 taxable receipts on the accrual method, and RA Rodriguez did not recompute those receipts on the cash method when she recomputed CVC's 2007 expenses. Use of inconsistent methods of computing receipts and expenses would not yield a clear reflection of CVC's income. See id. subdiv. (iv) (generally requiring a consistent method of

---

[20]No amount was entered on the line for accounts receivable as of yearend; but as the return preparer did not enter zeroes on all lines for items having a zero value, that may simply indicate that the yearend value for accounts receivable was zero.

[*46] accounting for receipts and expenses); see also Prabel v. Commissioner, 91 T.C. at 1112 (holding that the Commissioner cannot require a taxpayer to recompute his income under an improper method of accounting).

Fourth, before 2007 CVC was an accrual method taxpayer. As was true for 2006, CVC's method of accounting in 2007 did not change pursuant to section 446(b) or (e); and neither CVC's tax return nor its books reflects a deviation to the cash method that could, if consistently implemented, result in a change in method of accounting.[21]

We therefore conclude that, as an accrual method taxpayer, CVC could deduct the full $100,000 management fee for 2007. See sec. 1.446-1(c)(1)(ii), Income Tax Regs. (stating that an accrual method taxpayer may deduct an expense when "all the events have occurred that establish the fact of the liability", the

---

[21]We have suggested that a two-year deviation can establish a new method of accounting. See Johnson v. Commissioner, 108 T.C. 448, 494 (1997) ("If the change [in reporting method] affects the amount of taxable income for 2 or more taxable years without altering the taxpayer's lifetime taxable income, then it is strictly a matter of timing and constitutes a change in method of accounting."), aff'd in part, rev'd in part on other grounds, 184 F.3d 786 (8th Cir. 1999); see also Capital One Fin. Corp. v. Commissioner, 659 F.3d 316, 326 (4th Cir. 2011) ("Treatment of a material item consistently in two or more consecutively filed tax returns constitutes a method of accounting for which consent is required to change--even if that treatment is erroneous or an incorrect application of a chosen method."), aff'g 130 T.C. 147 (2008). However, respondent has not established even a one-year deviation. The evidence indicates that CVC was for 2006, 2007, and prior years an accrual method taxpayer.

**[\*47]** amount "can be determined with reasonable accuracy, and economic performance has occurred").

    E.    <u>2008 Lab Fees, Medical Supplies, and Professional Services</u>

For 2008 the amounts of CVC's claimed deductions for lab fees, medical supplies, and professional services expenses remaining in dispute are, respectively, $25,865, $135,431, and $12,955. Respondent contends that CVC was a cash method taxpayer for 2008, that CVC impermissibly accrued these expenses at yearend, and that Dr. Isaacs has not established that CVC incurred or paid these expenses during 2008.[22]

    1.    <u>Accounting Method</u>

Respondent bears the burden of proof with respect to his contention that CVC was a cash method taxpayer. <u>See</u> <u>supra</u> part II.B.1. As we did with respect to 2006 and 2007, we find that he has not satisfied that burden with respect to 2008.

On its 2008 Form 1120S, although CVC checked the box indicating that it had computed its income on the accrual method, CVC reported no opening and closing values for accounts receivable. CVC's 2008 tax reporting was consistent

---

[22]We analyze the 2008 disputed expenses in aggregate because respondent makes the same arguments concerning all three expense categories.

**[*48]** with Dr. Isaacs' testimony that, because its clients paid at the time of service, it did not carry accounts receivable on its books. The available evidence therefore suggests that during 2008, CVC took <u>receipts</u> into income at the time of receipt. This practice was consistent with the cash method of accounting and also, if CVC adhered strictly to its rule of requiring full payment from its customers at the time of service, with the accrual method of accounting. <u>See</u> sec. 1.446-1(c)(1)(i) and (ii), Income Tax Regs.

Turning to CVC's expenses, on its 2008 tax return, it reported opening and closing values for accounts payable. Reporting accounts payable would be inconsistent with the cash method, under which a liability is deductible only when actually paid. <u>See</u> <u>id.</u> However, the limited excerpts from CVC's books that are in the record--Quickbooks summary pages for lab fees, medical supplies, and professional fees--consistently show items being expensed when checks were paid, with the exception of a single expense in each category accrued at yearend.

Ms. Fogel's testimony sheds some light on this pattern. She served as CVC's bookkeeper from July 2008 through at least the time of trial. She testified that, for bills not paid in full before yearend, it was and is her practice to expense the amount of the bill and to also expense payments toward the underlying obligation made in the following year. Indeed, under incredulous questioning

**[*49]** from Dr. Isaacs, she twice confirmed this testimony.  If CVC was on the accrual method, Ms. Fogel's professed practice would result in the double deduction of affected expenses.

When Dr. Isaacs asked her, in apparent frustration:  "But based on [the] accrual method [of] accounting, if you expense the bill when you receive it, can you expense it again when you pay it?", she correctly answered, "No."  Dr. Isaacs then stated:  "Okay * * * do you follow that rule of accounting principles for Calabasas Veterinary Center when you do the books at Calabasas?"  She then answered, "Yes."

With respect to the disputed expenses, Ms. Fogel would have been the person to record expenses for bills received at yearend 2008 and, according to her professed practice, would have expensed payments on those bills made in 2009.  Illustratively, a Quickbooks "Vendor QuickReport" for Miller & Co. for 2008 and 2009 with entries for February 23, 2008, through December 31, 2009, reflects that Ms. Fogel credited a December 31, 2008, statement from Miller & Co. to accounts payable, thereby giving rise to the disputed professional fee expense, and then also booked check payments in early 2009 to accounts payable.

From the available evidence, we find that CVC did not follow a consistent method of accounting for its expenses for 2008.  Cf. Wright v. Commissioner,

[*50] T.C. Memo. 2007-50, 93 T.C.M. (CCH) 960, 965-966 (2007) (where an S

corporation checked boxes for both cash and accrual methods on its tax returns,

the corporation reported no accounts receivable on its returns, and the

corporation's sole owner claimed the corporation was on the accrual method,

holding that the corporation had no consistent method of accounting).

Nevertheless, because CVC was an accrual method taxpayer for prior years, we

conclude that CVC remained an accrual method taxpayer for 2008.[23]

In all years from its incorporation through 2005, CVC computed its income

for tax purposes on the accrual method. It reported having done so for 2006 and

2007, and we have concluded that the evidence in the record supports CVC's

---

[23]If CVC had accounted for its 2008 receipts on the cash method, then
accounting for its expenses on the accrual method would not yield a clear
reflection of income. See, e.g., Connors, Inc. v. Commissioner, 71 T.C. 913, 914-
917 (1979) (where the taxpayer used the cash method of accounting in computing
gross income from its business but deducted bonuses authorized but unpaid at
yearend, holding that the taxpayer "must use the cash method in computing bonus
compensation and other expenses"); Travis v. Commissioner, 47 T.C. 502, 509-
511 (1967) (where a "corporation was on the cash basis for most items of income
but was on an accrual basis for all items of expense", sustaining the
Commissioner's determination that this accounting system did not clearly reflect
income), aff'd in part, rev'd in part on other grounds and remanded, 406 F.2d 987
(6th Cir. 1969); see also sec. 1.446-1(c)(1)(iv), Income Tax Regs. ("[A] taxpayer
who uses the cash method of accounting in computing gross income from his trade
or business shall use the cash method in computing expenses of such trade or
business."). Yet as we have found, if CVC's pay-in-advance-of-service policy was
meticulously observed, then its method of accounting for its 2008 receipts was
consistent with the accrual method of accounting as well as the cash method.

**[\*51]** reporting position.  For CVC to be a cash method taxpayer for 2008, it would have had to change its method of accounting, but the evidence does not establish that such a change occurred.

First, as we have repeatedly noted, respondent did not exercise his section 446(b) authority to change CVC's method of accounting from accrual to cash; respondent simply insists that, as a factual matter, CVC was a cash method taxpayer for the years at issue.

Second, there is no evidence that CVC sought and obtained respondent's consent pursuant to section 446(e) to change its method of accounting.

And third, any irregularities in CVC's 2008 bookkeeping would represent, at most, a one-year deviation from its preexisting method of accounting.  Our caselaw suggests that, absent the Commissioner's direction under section 446(b) or his consent under section 446(e), a taxpayer may not change its method of accounting with such a short-lived deviation.  See Huffman v. Commissioner, 126 T.C. at 345-354 (reviewing this Court's caselaw and that of other courts dealing with what constitutes an accounting method change, and concluding that "a short-lived deviation from an already established method of accounting need not be viewed as establishing a new method of accounting").

[*52] To the extent that CVC's 2008 tax return reflects an erroneous application of or deviation from the accrual method, respondent could have pursued at least two courses of action to rectify the errors.  Respondent could have asserted section 446(e) and adjusted CVC's return to reflect a proper application of the accrual method.  See Capital One Fin. Corp. v. Commissioner, 130 T.C. at 155; accord Sunoco, Inc. v. Commissioner, 87 T.C.M. (CCH) at 945.  Alternatively, he could have exercised his authority under section 446(b) to change CVC to the cash method if it clearly reflected income, then recomputed both CVC's income and expenses on that method.  See Sunoco, Inc. v. Commissioner, 87 T.C.M. (CCH) at 944.  Respondent did neither, and he has not otherwise established, as a factual matter, that CVC changed its accounting method.  Consequently, we hold that CVC remained on the accrual method of accounting for 2008.

2.    Substantiation

Dr. Isaacs bears the burden of substantiating the 2008 disputed expenses.

a.    2008 Lab Fees

Of CVC's claimed $64,373 lab fees deduction for 2008, $25,865 remains in dispute.  The parties stipulated two relevant exhibits:  (1) a collection of source documents including an account receivable aging for CVC reflecting a $25,402.30

[*53] balance due as of December 30, 2008 (Antech bill),[24] and (2) a Quickbooks summary page for CVC's 2008 lab fees showing an expense for the Antech bill accrued on December 31, 2008. They also stipulated a list of lab fee expenses for 2008 totaling $38,508 that had been adequately substantiated.

On brief respondent identifies the disallowed lab fees deduction as comprising the accumulated Antech bill and $463 of wholly unsubstantiated expense. In comparing the stipulated list of substantiated expenses to the Quickbooks summary page, we have identified numerous discrepancies.[25] After reviewing the source documents collected in Exhibit 14-P, we find that these records substantiate not only the amounts of expense on the stipulated list but also an additional $463 payment to Heska Corp. for laboratory services paid by CVC

---

[24]Respondent reserved a hearsay objection to handwritten notations on the documents collected in Exhibit 14-P, and petitioner offered no rebuttal argument. We conclude these notations are inadmissible hearsay and will not consider them.

[25]The vendor names, dates, check numbers, and amounts on the stipulated list all correspond to information on the Quickbooks summary page. However, it appears that one entry in the vendor column and one entry in the check number column were skipped on the stipulated list. Many expense amounts on the stipulated list are assigned to dates and vendors different from those delineated on the Quickbooks summary page. For example, the Quickbooks summary page lists a $3,000 check payment to Antech on September 19, 2008. The next listed payment is to Idexx Distribution Corp. (Idexx) on September 25, 2008, for $133. The next listed payment is to Antech. The stipulated list attributes the $3,000 September 19 payment to Idexx rather than to Antech, and it attributes the $133 September 25 payment to Antech rather than to Idexx.

[*54] check No. 40345 on December 8, 2008. We therefore redetermine respondent's determination as to that expense and allow this $463 deduction.

With regard to the remaining amount, we find the Antech bill and the Quickbooks summary page, coupled with Dr. Isaacs' testimony that CVC regularly used this vendor during this time for laboratory services, sufficient to substantiate the expense under the accrual method of accounting. We will therefore allow a deduction for this expense.

### b.     2008 Medical Supplies

Of CVC's claimed $266,258 medical supplies expense deduction for 2008, $135,431 remains in dispute. The parties stipulated portions of CVC's and EVC's books relevant to the claimed 2008 medical supplies expense deduction: (1) a Quickbooks summary page for CVC's 2008 medical supplies expenses showing amounts accrued on December 31, 2008, of $24,751 for drugs, $25,506 for surgical supplies, and $88,304 for other medical supplies, for a total of $138,561;[26] and (2) printouts of the Quickbooks general ledgers for CVC and EVC for December 31, 2008, reflecting corresponding debits and credits for drugs, surgical

---

[26]We attribute the discrepancy between this amount and the amount remaining in dispute to the parties' debiting two journal entries, for $3,000 and $130, from the total yearend accrued expense.

[*55] supplies, and medical supplies in the same amounts shown on the Quickbooks summary page.

Dr. Isaacs testified that the 2008 medical supplies expense represented reimbursement of EVC for consumables ordered in bulk and paid for by EVC but used by CVC pursuant to the interoffice policy. He further testified that EVC included this amount in income.

On the basis of the foregoing, we conclude that Dr. Isaacs has adequately substantiated the 2008 medical supplies expense, and we will consequently allow a $135,431 deduction for it.

c.     2008 Professional Services

Of CVC's claimed $74,686 professional services expense deduction for 2008, $12,955 remains in dispute. The parties stipulated a Quickbooks summary page for CVC's 2008 professional fees expenses showing a December 31, 2008, accrued expense of $13,283 to Miller & Co., CVC's accounting firm. Respondent contends that this accrued expense accounts for the still-disputed amount.[27]

---

[27]We attribute the $328 difference between the accrued expense and the amount remaining in dispute to (1) the parties' stipulation to the existence of two $14 check payments to Bjorn Corp., on March 1 and April 1, 2008, that do not appear on CVC's Quickbooks summary page, and (2) a numerical discrepancy between the Quickbooks summary page and the stipulation of facts. According to the Quickbooks summary page, CVC paid $1,500 by check No. 40078 to Cohen,

(continued...)

[*56] In his testimony Dr. Isaacs asserted that deductions for two invoices from Miller & Co. had been disallowed and that the amounts had been expensed when the invoices were received. The two invoices to which he referred are dated September 15 and October 15, 2008, and are for, respectively, $7,950 and $4,995, for a total of $12,945.[28] The amounts and dates of these two invoices do not precisely correspond to the amount of the disallowed expense or the date on which the Quickbooks summary page reflects that it was recorded on CVC's books. However, the invoices do not otherwise appear on the Quickbooks summary page, and the parties stipulated no payments corresponding to them. From the evidence before us, we infer that CVC did not pay or expense the September 15 and October 15 invoices upon receipt, and that either (1) Miller & Co. may have sent a yearend statement reflecting these outstanding balances and possibly some additional charges or (2) during the latter part of 2008 Ms. Fogel generally recorded CVC's professional fees expenses when paid, but then she, or the

---

[27](...continued)
Miskei & Mowrey on July 21, 2008. The parties stipulated that Dr. Isaacs had substantiated this expense, check No. 40078, but in the amount of $1,800.

[28]These invoices appear within Exhibit 17-P at pp. 6 and 7. Respondent reserved a hearsay objection to handwritten notations on various documents within the exhibit. We sustain that objection and have not considered the handwritten notations.

**[\*57]** accounting firm to close the books, accrued an expense for the outstanding balances at yearend.  Either way, we think the evidence suffices to substantiate the claimed expense.

Although generally an uncorroborated entry in a taxpayer's books will not suffice to substantiate an expense, see, e.g., Olive v. Commissioner, 139 T.C. at 32-33, Dr. Isaacs produced invoices to corroborate the journal entry.  The dates and aggregate amount of those invoices may not correlate perfectly with the dates and amounts entered in CVC's books, but they do establish an adequate factual basis upon which to allow a deduction.  See Cohan v. Commissioner, 39 F.2d at 544.

F.    Summary

We conclude that the following amounts of the disputed expenses are allowable as deductions:

| Expense | 2006 | 2007 | 2008 |
|---|---|---|---|
| Ancillary expenses | $85,000 | --- | --- |
| Lab fees | -0- | -0- | $25,865 |
| Office overhead | --- | $100,000 | --- |
| Medical supplies | --- | --- | 135,431 |
| Professional fees | --- | --- | 12,955 |

Respondent properly disallowed deductions for the other disputed expenses.

[*58] III.     Accuracy-Related Penalties

For all three tax years at issue, respondent determined accuracy-related penalties under section 6662(a) on the basis of, in the alternative, (1) negligence or disregard of rules and regulations or (2) a substantial understatement of income tax.[29]

As a general rule, the Commissioner bears the burden of production and "must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty." Higbee v. Commissioner, 116 T.C. 438, 446 (2001); see also sec. 7491(c). Once the Commissioner has met this burden of production, the burden will shift to the taxpayer to prove an affirmative defense or that he is

---

[29]The notice of deficiency also lists a substantial valuation misstatement as an alternative basis for the penalty. Sec. 6662(a) and (b)(3) provides for imposition of a 20% penalty on the portion of an underpayment of tax required to be shown on a return that is attributable to a substantial valuation misstatement. For returns filed on or after August 17, 2006, as is relevant here, a substantial valuation misstatement occurs when "the value of any property (or the adjusted basis of any property) claimed on any return of tax imposed by chapter 1 is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)". Sec. 6662(e)(1)(A). The notice of deficiency does not explain what property's value or adjusted basis respondent believes Dr. Isaacs misstated. Respondent made no argument concerning the substantial valuation misstatement penalty at trial and does not do so on brief. As the Court can find no evidentiary basis for this penalty in the record, we conclude Dr. Isaacs is not liable for the substantial valuation misstatement penalty.

**[\*59]** otherwise not liable for the penalty.  See Higbee v. Commissioner, 116 T.C. at 446-447.

A.    Petitioner's Liability

Section 6662(a) and (b)(1) and (2) provides for the imposition of a 20% penalty on the portion of an underpayment of tax attributable to negligence or disregard of rules and regulations or a substantial understatement of income tax. "'[N]egligence' includes any failure to make a reasonable attempt to comply with the provisions of * * * [the Internal Revenue Code]".  Sec. 6662(c).  It constitutes "'a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'"  Freytag v. Commissioner, 89 T.C. 849, 887 (1987) (quoting Marcell v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), aff'g 43 T.C. 168 (1964) and T. C. Memo. 1964-299), aff'd, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991).  "'Negligence' also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly." Sec. 1.6662-3(b)(1), Income Tax Regs.  Disregard of rules and regulations includes any careless, reckless, or intentional disregard of the Code, the regulations thereunder, or certain Internal Revenue Service (IRS) administrative guidance.  Id. subpara. (2).  A substantial understatement of income

[*60] tax as to an individual is an understatement that exceeds the greater of $5,000 or 10% of the tax required to be shown on the return.  Sec. 6662(d)(1)(A).

Whether a substantial understatement exists, and if so, in what amount, will depend upon the recalculation of Dr. Isaacs' tax liabilities on the basis of this opinion.  We leave this calculation to the parties under Rule 155.

With regard to the negligence penalty, respondent contends that Dr. Isaacs was negligent because he failed to maintain adequate books and records and to substantiate items properly.[30]  We agree.

---

[30]Respondent makes two additional arguments that are wholly unsupported by the record.  First, respondent asserts that Dr. Isaacs knew that he needed appraisals prepared by a qualified appraiser in order to deduct his charitable contributions to CAS, that he accordingly prepared "false" appraisals and submitted them to respondent and the Court, and that he thereby sought to "circumvent" the applicable regulations.  Respondent does not support these allegations with record citations, and the Court can identify no evidence that would.  Dr. Isaacs evidently knew that he needed to submit appraisals of the contributed fossils to the IRS, but nothing suggests he was aware of the requirement that they be "qualified" appraisals prepared by a "qualified appraiser".  Moreover, no evidence in the record indicates that Dr. Isaacs acted with any motive to deceive in attempting to secure appraisals in the manner in which he did.
Second, respondent contends that Dr. Isaacs followed "a pattern to inflate the expenses of CVC at the end of the year to avoid taxation by manipulating the books of his related corporations."  Respondent has identified one expense in each of 2006 and 2007 and three expenses in 2008 that were accrued and deducted at yearend.  Of these expenses, only three involved alleged payments to EVC.  This hardly constitutes a "pattern".  More saliently, there is no direct or circumstantial evidence in the record that Dr. Isaacs acted with any tax avoidance motive.

[*61] Although we consider Dr. Isaacs' failure to obtain a qualified appraisal to be, essentially, a foot fault, he also failed to satisfy several other substantiation requirements applicable to his claimed charitable contribution deductions. For example, he lacked records substantiating his bases in the donated fossils, and the written acknowledgments he received from CAS did not state whether it had supplied goods or services in exchange for Dr. Isaacs' gifts. Dr. Isaacs testified to having consulted a guide published by the IRS to determine which methods of accounting were available to CVC. Yet on the record before us, he did not conduct even basic research concerning the requirements for a charitable contribution deduction.[31] A reasonably prudent taxpayer, especially one who had contributed items with values exceeding $100,000, would have taken steps to acquaint himself with the procedures and requirements for deducting noncash charitable contributions. Dr. Isaacs did not, and as a result, he failed to properly substantiate those contributions.

Turning to CVC's expenses, Dr. Isaacs could not substantiate some of the disputed expenses considered in this opinion and evidently failed to maintain

---

[31]IRS Publication 526, Charitable Contributions, provides detailed guidance on which records a taxpayer claiming a noncash charitable contribution deduction must keep. The current version is available at http://www.irs.gov/pub/irs-pdf/p526.pdf.

[*62] complete and accurate books and records for CVC. From his consistent failure to produce certain items--throughout the audit process, for RA Rodriguez's pretrial examination, or for trial itself--we can only infer these items' nonexistence. Most glaringly, although Dr. Isaacs apparently had access to CVC's Quickbooks files for 2006 through 2008, producing summaries for various expense categories specifically questioned by respondent, he never produced complete books for CVC. Similarly, although three of the disputed expenses consisted of alleged payments to EVC, he did not provide respondent with copies of EVC's yearend financial statements (other than a 2007 profit and loss statement) or portions of its books (other than journal entries) that would corroborate his testimony that EVC included these amounts in income. A reasonably prudent taxpayer would have maintained these records, and in any case, section 6001 mandated that Dr. Isaacs do so. For the foregoing reasons, we find that respondent has satisfied his burden of production as to the negligence penalties. See sec. 1.6662-3(b)(1), Income Tax Regs.[32]

---

[32]Whatever the outcome of the Rule 155 computation, Dr. Isaacs will be liable for only one 20% penalty, as the accuracy-related penalties do not stack. See sec. 1.6662-2(c), Income Tax Regs.

**[\*63]** B.     <u>Dr. Isaacs' Defense</u>

Section 6664(c) provides a defense to the section 6662(a) penalties with respect to any portion of an underpayment of tax for which the taxpayer had reasonable cause and with respect to which the taxpayer acted in good faith. "The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances." Sec. 1.6664-4(b)(1), Income Tax Regs. "Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." <u>Id.</u>

Dr. Isaacs asserts that the reasonable cause and good faith defense shields him from the determined penalties because he relied upon his longtime accounting firm to prepare his and CVC's returns and upon bookkeepers to keep CVC's books.[33] We think it also relevant that Angela Lopez, CVC's bookkeeper prior to

---

[33]Dr. Isaacs further contends that he underwent previous audits in which respondent found no fault with how he had documented prior years' noncash charitable contributions. Dr. Isaacs did not put these facts into evidence. Although he did refer during the trial to a 1997 audit in which an analogous charitable contribution had been reviewed, he did so before being sworn in as a witness, and respondent had no opportunity to cross-examine him on this subject.

A taxpayer's reliance upon the outcome of a prior audit may establish reasonable cause and good faith. <u>E.g.</u>, <u>Rooney v. Commissioner</u>, T.C. Memo. 2011-14, slip op. at 6-7; <u>Rosemann v. Commissioner</u>, T.C. Memo. 2009-185, 98 T.C.M. (CCH) 98, 103 (2009); <u>De Boer v. Commissioner</u>, T.C. Memo. 1996-174,

(continued...)

[*64] July 2008, removed and did not return some of its business records, and we address this issue as well.

### 1. Reasonable Reliance

A taxpayer may establish a section 6664(c) reasonable cause defense by showing that he or she relied reasonably and in good faith on a third party's advice in taking the disputed tax position. See sec. 1.6664-4(c), Income Tax Regs. We have held that, to establish this variation of the defense, "the taxpayer must prove * * * that * * * : (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate

---

[33](...continued)
71 T.C.M. (CCH) 2730, 2739 (1996); see also sec. 1.6664-4(b)(1), Income Tax Regs. ("Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer."). However, Dr. Isaacs did not establish that he followed the same documentation procedures observed for 2006 and 2007 with respect to a prior, analogous charitable contribution, or that respondent acquiesced in those procedures after auditing the prior year's return.

Dr. Isaacs also pointed to a "Veterinary Audit Technique Guide" allegedly published by the IRS as authority for CVC's method of accounting. The Court found this document on the IRS' Web site. See IRS, Veterinary Audit Technique Guide (2005), available at http://www.irs.gov/pub/irs-mssp/vet-52809.pdf. As Dr. Isaacs represented, it explains that, generally, a veterinary practice organized as an S corporation may use the accrual method. Id. at 2-4 through 2-6. But that is beside the point. Respondent has not asserted that CVC was not, as a legal matter, entitled to compute its taxable income according to an accrual method of accounting. Instead, he claims that, as a factual matter, CVC's books were kept on the cash method.

[*65] information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see also Charlotte's Office Boutique, Inc. v. Commissioner, 425 F.3d 1203, 1212 & n.8 (9th Cir. 2005) (quoting three-prong test in Neonatology Assocs. with approval), aff'g 121 T.C. 89 (2003), supplemented by T.C. Memo. 2004-43.

Dr. Isaacs presented testimony from a certified public accountant, Paul Cook, who at the time of trial had 33 years of experience and was a partner in Miller & Co., CVC's accounting firm. We need not decide whether Mr. Cook was a competent professional having sufficient expertise to justify reliance, satisfying the first Neonatology factor, because Dr. Isaacs failed to satisfy the other two requirements in any event. Mr. Cook confirmed that he had "seen tax and accounting materials" for Dr. Isaacs and CVC's 2006, 2007, and 2008 tax years, and he referred to having reviewed records for CVC dating back to 1999. But because the record does not disclose what information, if any, Dr. Isaacs provided to him concerning the disputed expenses and charitable contributions, we cannot evaluate whether that information was relevant and accurate. Furthermore, Mr. Cook did not prepare Dr. Isaacs' returns or CVC's returns or handle CVC's account for any of the tax years at issue. Consequently, absent more evidence not

**[*66]** in the record, we cannot find that Dr. Isaacs could have relied upon advice from Mr. Cook in taking the return positions disputed in this case.[34]  Indeed, Mr. Cook did not testify to having provided any advice to Dr. Isaacs or CVC, and Dr. Isaacs never alleged that Mr. Cook had done so.

Dr. Isaacs also presented evidence concerning two bookkeepers, Ms. Lopez and Ms. Fogel, who maintained CVC's books during successive portions of the tax years at issue.  According to Dr. Isaacs' own witnesses, Ms. Lopez was grossly incompetent and untrustworthy.  Ms. Fogel, in turn, testified only that she had been a professional bookkeeper since 1979, and the record contains no other information concerning her credentials or expertise.  Dr. Isaacs has not established that either Ms. Lopez or Ms. Fogel was "a competent professional who had sufficient expertise to justify reliance".  See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99.  Similarly, he has not established that he provided

---

[34]While questioning Mr. Cook, Dr. Isaacs stated--outside the context of sworn testimony--that an accountant named Jerry Davis had maintained CVC's books during the years at issue and had since retired.  Dr. Isaacs offered no evidence concerning Mr. Davis' credentials.  He did not explain what information, if any, he had provided to Mr. Davis.  He did not articulate what advice, if any, Mr. Davis provided to him regarding his obligation to substantiate expenses, CVC's accounting methods, and/or the documentation requirements for a noncash charitable contribution deduction.  Hence, Dr. Isaacs satisfied none of the three Neonatology factors with respect to Mr. Davis.

[*67] either bookkeeper with necessary and accurate information, that either bookkeeper provided him with advice,[35] or that he relied in good faith upon such advice.

We conclude that Dr. Isaacs has failed to establish reasonable cause and good faith on the basis of reasonable reliance.[36]

### 2. Other Circumstances

With regard to the 2006 and 2007 lab fees, deductions for which have been disallowed for lack of substantiation, Dr. Isaacs presented credible evidence that CVC's bookkeeper, Ms. Lopez, stole records from the clinic in or around mid-

---

[35]Although "[a]dvice does not have to be in any particular form", it must consist of a "communication * * * setting forth the analysis or conclusion of a person, other than the taxpayer, provided to (or for the benefit of) the taxpayer and on which the taxpayer relies". Sec. 1.6664-4(c)(2), Income Tax Regs. Dr. Isaacs asserts that he relied upon Ms. Lopez and Ms. Fogel to handle CVC's bookkeeping, but he has not identified any communication that either woman made to him. Rather, it appears that he simply handed off bookkeeping duties to them and did not review their work or specifically inquire about their activities to the extent of a reasonable, prudent businessperson.

[36]Dr. Isaacs has not claimed that he reasonably relied upon Mr. Marshall with respect to substantiation of his charitable contributions to CAS. In any event, however, Mr. Marshall testified that he did not recall and had not written the purported appraisals that Dr. Isaacs submitted with his 2006 and 2007 returns. We have no evidence concerning Mr. Marshall's competence to advise on tax-related matters (we accepted him as an expert in fossil valuation), and the record does not support a finding that Mr. Marshall advised Dr. Isaacs concerning his return positions. Accordingly, Dr. Isaacs has not established reasonable reliance on Mr. Marshall under the Neonatology test.

**[\*68]** 2008 and left its books in disarray. Dr. Isaacs went to Ms. Lopez's home with the police three times in efforts to retrieve those records. His efforts having proven fruitless, he attempted to reconstruct CVC's records, and he largely succeeded. RA Rodriguez testified that Dr. Isaacs had "provided the support to almost everything that was on * * * [CVC's Quickbooks] expense summary." By the time of trial, the parties had significantly narrowed the disputed issues in the notice of deficiency.

We find that Dr. Isaacs had reasonable cause for, and acted in good faith with respect to, the portions of his underpayments attributable to CVC's claimed deductions for the 2006 and 2007 lab fees that we have disallowed. See, e.g., Stewart v. Commissioner, T.C. Memo. 2010-184, 100 T.C.M. (CCH) 149, 156 (2010) (finding reasonable cause where a co-owner took records relating to the taxpayer's real property and the taxpayer attempted to reconstruct the records); Haley v. Commissioner, T.C. Memo. 1977-348, 36 T.C.M. (CCH) 1397, 1399 (1977) (finding reasonable cause where the taxpayer's former wife took possession of necessary business records, and the taxpayer exhausted reasonable means of reclaiming them). As to the balance of his underpayments, he has failed to establish a reasonable cause and good faith defense, and we will sustain

**[\*69]** respondent's determination of the accuracy-related penalties on the basis of negligence or disregard for 2006 and 2007.

The Court has considered all of the parties' contentions, arguments, requests, and statements.  To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

Decision will be entered under

Rule 155.